Reggie WHITE, Michael Buck, Hardy Nickerson, Vann McElroy and Dave Duerson, Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE; The Five Smiths, Inc.; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; The Dallas Cowboys Football Club, Ltd.; PDB Sports, Ltd.; The Detroit Lions, Inc.; The Green Bay Packers, Inc.; Houston Oilers, Inc.; Indianapolis Colts, Inc.; Kansas City Chiefs Football Club, Inc.; The Los Angeles Raiders, Ltd.; Los Angeles Rams Football Company, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club, Inc.; KMS Patriots Limited Partnership; The New Orleans Saints Limited Partnership; New York Football Giants, Inc.; New York Jets Football Club, Inc.; The Philadelphia Eagles Football Club, Inc.; B & B Holdings, Inc.; Pitts-

burgh Steelers Sports, Inc.; The Chargers Football Company; The San Francisco Forty–Niners, Ltd.; The Seattle Seahawks, Inc.; Tampa Bay Area NFL Football Club, Inc.; and Pro–Football, Inc., Defendants.

Civ. No. 4–92–906.

United States District Court,
D. Minnesota,
Fourth Division.

April 30, 1993.

**1394**

Edward M. Glennon, Carol T. Rieger, Charles J. Lloyd, and Lindquist & Vennum, Minneapolis, MN, and James W. Quinn, Jeffrey L. Kessler, Jonathan T. Weiss, and Weil, Gotshal & Manges, New York City, for plaintiffs.

James Fitzmaurice, Daniel J. Connolly, Faegre & Benson, Minneapolis, MN, Herbert Dym, Gregg H. Levy, and Covington & Burling, Washington, DC and Frank Rothman, Shepard Goldfein, Douglas B. Adler, and Skadden, Arps, Slate, Meagher & Flom, Los Angeles, CA for defendants.

Peter S. Hendrixson, Dorsey & Whitney, Minneapolis, MN and Maxwell M. Blecher, and Blecher & Collins, Los Angeles, CA, for defendant Philadelphia Eagles Football Club, Inc.

## ORDER

DOTY, District Judge.

### BACKGROUND

Plaintiffs filed the present antitrust class action on September 21, 1992, less than two weeks after a jury rendered its verdict in *McNeil v. National Football League*, Civ. No. 4–90–476, 1992 WL 315292 (D.Minn. Sept. 10, 1992) (special verdict).[1] The present action, *McNeil*, and most of the other litigation that the parties seek to resolve by the global settlement referenced herein, challenge various NFL player rules, including the right of first refusal/compensation component of Plan B, the college draft, the NFL Player Contract and the preseason pay rules. For many years, those and other rules have been the source of numerous disputes between players and the NFL.[2]

---

1. In *McNeil*, eight individual football players whose contracts with their National Football League ("NFL") employers expired on February 1, 1990, brought an action alleging that the NFL's right of first refusal/compensation rules as set forth in Plan B violate Section 1 of the Sherman Act.

2. For example, in 1972, several players brought an action that successfully challenged a predecessor of Plan B, the Rozelle Rule. *Mackey v. National Football League*, 407 F.Supp. 1000 (D.Minn.1975), *aff'd in part, rev'd in part*, 543 F.2d 606, 610–11 (8th Cir.1976) (although not *per se* illegal, Rozelle Rule violates rule of rea-

The five named plaintiffs [3] filed the present case on behalf of themselves and all other past, present, and future NFL players similarly situated during the period specified in the second amended complaint.[4] Defendants are the National Football League and its twenty-eight member clubs. The complaint, which originally sought only injunctive relief, was amended to seek both antitrust injunctive relief and damages stemming from the operation of the right of first refusal rules of Plan B, the college draft, the NFL player contract and the preseason pay rules. The second amended complaint also alleges that defendants illegally fixed players' medical insurance benefits and tortiously interfered with players' prospective contracts. Defendants answered the complaint, denying all of plaintiffs' material allegations and asserting various affirmative defenses and counterclaims.

On October 15, 1992, plaintiffs moved for a preliminary injunction that would have barred defendants from enforcing the right of first refusal/compensation rules of Plan B, or imposing any other player reservation system, on veteran NFL players whose contracts were to expire on February 1, 1993. Defendants opposed that motion, which was still pending when the parties, with the assistance of this court, reached a tentative agreement to settle this action on January 6, 1993.[5]

By order dated January 6, 1993, as amended and reaffirmed on February 17, 1993, the court certified, for the purposes of settlement, a damages and injunctive relief class pursuant to Federal Rule of Civil Procedure 23(b)(1) consisting of:

(i) all players who have been, are now, or will be under contract to play professional football for an NFL club at any time from August 31, 1987 to the date of final approval of the settlement of this action and the determination of any appeal therefrom, and (ii) all college and other football players who, as of August 31, 1987, through the date of final approval of the settlement of this action and the determination of any appeals therefrom, have been, are now, or will be eligible to play football as a rookie for an NFL team.

*See White v. National Football League*, Civ. No. 4–92–906, slip op. (D.Minn. Jan. 6, 1993) (entered *nunc pro tunc*); *White v. National Football League*, Civ. No. 4–92–906, slip op. (D.Minn. Feb. 17, 1993); Pls.' Second Am. Compl. at 8. Those mandatory class certification orders have provided a vehicle for the settlement of, among other things, all player challenges to the Plan B veteran player reservation rules, the college draft and the preseason pay rules. The settlement is the critical step toward the final resolution of the longstanding dispute between the NFL clubs and their player-employees.

On February 26, 1993, plaintiffs and defendants entered into a Stipulation and Settlement Agreement, which encompasses the terms of the proposed settlement and is de-

---

son), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); *see also Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1183–89 (D.C.Cir. 1978) (NFL draft violates rule of reason); *Brown v. Pro Football, Inc.,* Civ. No. 90–1071, slip op. at 19–23, 1992 WL 88039, at *9–10 (D.D.C. March 10, 1992) (applying rule of reason, and granting plaintiffs' motion for summary judgment on defendants' antitrust liability for fixing the wages of developmental squad players for the 1989 NFL season); *Kapp v. National Football League,* 390 F.Supp. 73, 82–83 (N.D.Cal.1974) (NFL draft and Rozelle Rule not justified by rule of reason), *judgment aff'd on other grounds, appeal dismissed in relevant part as moot,* 586 F.2d 644 (9th Cir. 1978), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979); *see also infra* notes 35 & 36 (listing various player disputes).

3. Those players are: Reggie White, Michael Buck, Hardy Nickerson, Vann McElroy and Dave Duerson.

4. The second amended complaint specifically encompasses:

(i) all players who have been, are now, or will be under contract to play professional football for an NFL club at any time from August 31, 1987 to the date of final judgment in this action and determination of any appeal therefrom, and (ii) all college and other football players who, as of August 31, 1987, to the date of final judgment in this action and the determination of any appeal therefrom, have been, are now, or will be eligible to play football as a rookie for an NFL team.

(Pls.' Second Am. Compl. at 8.)

5. During the weeks that followed, class counsel and NFL representatives engaged in numerous meetings seeking to produce a final document that would reflect the substance of their agreement. The Stipulation and Settlement Agreement represents the culmination of those negotiations.

signed to bring an end to the present action and a wide range of related litigation. In an order dated February 26, 1993, based on its review of the file, record and proceedings to date, this court preliminarily approved the proposed settlement as fair, reasonable and adequate, specifically finding that:

1. The proposed settlement adequately addresses plaintiffs' predominant claim for relief, namely structural, injunctive relief because it will radically alter the NFL's system of player restraints and provide unprecedented free agency to NFL players.

2. The proposed settlement also adequately addresses plaintiffs' claim for monetary recovery, because it will provide for substantial payments to be distributed fairly among the named plaintiffs and class members in settlement of their past claims against the NFL and its teams.

3. There are substantial novel and complex legal and factual issues involved in this case, precluding any guarantee as to certainty of outcome.

4. The establishment of damages would be uncertain, difficult, costly, and extremely time-consuming.

5. The establishment of plaintiffs' claims regarding preseason compensation are uncertain and are subject to counterclaims that may substantially affect the likelihood of any recovery.

6. Given the long history of this dispute, the parties are uniquely positioned to assess the overall reasonableness of the proposed settlement.

7. The proposed settlement was the product of good faith bargaining at arm's length between the parties.

8. Class Counsel is adequately representing the interests of the named plaintiffs and all class members.

*See White v. National Football League,* Civ. No. 4–92–906, slip op. at 2–3 (D.Minn. Feb. 26, 1993).

In accordance with Federal Rule of Civil Procedure Rule 23(e), the court ordered plaintiffs, at their own expense, to send written notice by mail to class members.[6] The court also ordered plaintiffs to publish a summary notice in *USA Today.* Those notices, which were approved by the court, described the terms of the proposed settlement and informed all class members that a final approval hearing would be held on April 16, 1993, to determine whether the proposed settlement was fair, reasonable and adequate. The notices also informed class members that they had a right to submit written objections and to appear at the final approval hearing, in person or by counsel, to be heard in support of, or in opposition to, the settlement, or make any other statement of their position concerning the settlement. *See* Notice of Class Action Settlement and Summary Notice.

Following a resolution of the Board of the National Football League Players Association (the "NFLPA") to seek to become the collective bargaining representative of NFL players,[7] in mid-January 1993, the NFLPA began to collect authorization cards from NFL players designating it as the exclusive collective bargaining representative of NFL players.

By letter dated March 23, 1993, the NFLPA informed the NFL that:

[a] majority of the players on 1992 season-ending rosters have now signed cards au-

---

6. On March 12, 1993, plaintiffs mailed notice to 4,957 class members who are current or former NFL players. During the week of March 8, 1993, plaintiffs mailed notices to 343 college players who attended the NFL's Rookie Combine this year.

7. After the Eighth Circuit determined that the nonstatutory labor exemption continues to protect NFL veteran player rules as long as an "ongoing collective bargaining relationship" exists, *Powell v. National Football League,* 888 F.2d 559, 568 (8th Cir.1989), *superseded by,* 930 F.2d 1293, 1303 (8th Cir.1989), this court, in its order

of May 23, 1991, determined that various actions taken by the players and the NFLPA resulted in the termination of the NFLPA's "status as a labor organization." *Powell and McNeil v. National Football League,* 764 F.Supp. 1351, 1356 (D.Minn.1991) (holding only in *McNeil* ).

On June 12, 1991, the Eighth Circuit denied defendants' motion for interlocutory appeal on that ruling. *McNeil,* No. 91–8088 (8th Cir. June 12, 1991).

The NFL defendants still maintain that the NFLPA has never ceased to function as the players' bargaining representative and thus the nonstatutory labor exemption has never ended.

thorizing the NFLPA to represent them for purposes of collective bargaining. (Letter from Richard A. Berthelsen to Paul Tagliabue dated March 23, 1993.) After confirmation of the authenticity of the cards by an independent entity, the American Arbitration Association, the NFL voluntarily recognized the NFLPA as the exclusive collective bargaining representative of the NFL players. (Letter from Harold Henderson to Eugene Upshaw dated March 29, 1993.)

Since March 31, 1993, the NFLPA and representatives of the NFL Management Council, the multi-employer bargaining unit of the NFL owners, have been negotiating in an effort to reach a new collective bargaining agreement.[8] As of the date of the final approval hearing, April 16, 1993, those negotiations remained ongoing.[9]

This case is presently before the court on the motion of the parties for final approval of the Stipulation and Settlement Agreement, which fundamentally revises many of the employment practices at issue in this litigation. The five representative plaintiffs (all of whom are active or former NFL players), class counsel, representatives of the NFLPA, and at least twenty-eight of the twenty-nine defendants [10] view the proposed settlement as a fair, reasonable and adequate method of resolving this litigation. All of those parties believe that the proposed settlement advances and protects the interests of all class members, and provides the framework for labor peace within the NFL after almost six years of strife.

The court has an extensive record on which to evaluate the fairness, reasonableness and adequacy of the proposed settlement. In addition to voluminous submissions made by the parties in support of preliminary and final approval of the proposed settlement, the court has extensive knowledge of the issues involved in this litigation as a result of more than five years of experience presiding over the present action and its predecessors. In addition to the record in the present action, the court has full access to, and intimate familiarity with, the records in *Powell, McNeil, Five Smiths v. National Football League*, 788 F.Supp. 1042 (D.Minn. 1992), *National Football League v. National Football League Players Ass'n & Hilton*, Civ. No. 4–91–877 (D.Minn. filed Oct. 15, 1991), and *Jackson v. National Football League*, 802 F.Supp. 226 (D.Minn.1992). Of particular help to the court is the record in *McNeil*, which includes the *McNeil* trial transcript, comprising more than 8400 pages, and the evidence received in *McNeil*, which includes over 400 trial exhibits. The testimony and evidence received in the foregoing cases has also been supplemented by arguments of counsel and numerous legal memoranda.

In a total class of well over 5,000 players, seventy-three objections were filed on behalf of active or former NFL players.[11] In addi-

---

8. The last collective bargaining agreement between players and defendants expired in August 1987.

9. As of the date of this order, April 30, 1993, the NFLPA and the NFL Management Council had not yet reached agreement on a collective bargaining agreement.

10. As discussed more fully *infra, see* Section VII(B), the Philadelphia Eagles object to the NFL's recognition of the NFLPA as a labor union and to any potential settlement of a related dispute over licensing agreements, *NFLPA v. NFL Properties*, No. 90–CV–4244 (S.D.N.Y.) (filed June 25, 1990).

11. As of the deadline for filing objections, April 2, 1993, the following active or former NFL players had filed objections: Wilber Marshall, Paul Gruber, Brian Washington, Carl Lee, Mark Dusbabek, Audray McMillian, Felix Wright, Cody Risien, Mark Harper, Sammy Martin, Mike Farr, Pepper Johnson, Don Beebe, Gregory Scales, Gregory J. Baty, Barry Sanders, Luis Sharpe, Steve Atwater, Horatio Benny Blades, James Hasty, Byron Evans, Michael C. Johnson, Reggie Langhorne, Maurice Hurst, John Fourcade, Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith, Van Waiters, Broderick Thompson, Terry Orr, Shane Collins, Ron Middleton, Mark Schlereth, Kelly Goodburn, David Gulledge, Ed Simmons, Matt Elliott, Joe Jacoby, Sidney Johnson, Kurt Gouveia, Ravin Caldwell, Mark Rypien, James Jenkins, Johnny Thomas, Eric Williams, Don Warren, John Elliott, Duane Bickett and Steve Young.

Since April 2, 1993, additional objections have been filed on behalf of Brian Blades, Roland James, Pat Carter, Kenneth F. Ruettgers, Jerry Ball, Jeff Bostic, Todd Bowles, Ray Brown, Jason Buck, Earnest A. Byner, Desmond Howard, Anthony Johnson, Brian Mitchell, Ricky Sanders and Paul Siever.

At the hearing, the court granted all motions to extend time, ruling that all objections filed as of the hearing date, April 16, 1993, would be con-

tion, objections were filed on behalf of one NFL member club, the Philadelphia Eagles, sixteen college players,[12] and one player agent.[13]

The court's evaluation of the proposed settlement must necessarily proceed in light of the *McNeil* jury verdict. Following a ten-week trial, from June 15 to September 10, 1992, the jury returned its special verdict, finding that the Plan B right of first refusal/compensation rules (1) had "a substantially harmful effect on competition in the relevant market for the services of professional football players"; (2) "significantly contribute[d] to competitive balance in the NFL"; and (3) were "more restrictive than reasonably necessary to achieve ... competitive balance." *See McNeil v. National Football League*, Civ. No. 4–90–476, 1992 WL 315292, at *1 (D.Minn. Sept. 10, 1992) (special verdict form). Although the jury found that all plaintiffs had suffered antitrust injury, it awarded damages to only four of the eight

plaintiffs in the total amount of $543,000, before trebling.[14] *See id.*

Because the parties reached a tentative agreement to settle the present litigation before the court entered final judgment in *McNeil*, defendants were unable to file an appeal.[15] Thus, neither the liability nor damages issues in *McNeil* have been finally resolved.

Defendants believe that an appeal of the *McNeil* verdict would present complex and unsettled questions regarding the NFL's antitrust liability arising from the operation of Plan B including, among other things, the scope of the nonstatutory labor exemption, the application of the rule of reason under Section 1 of the Sherman Act,[16] and the court's instructions regarding burden of proof and antitrust injury. Although plaintiffs disagree with defendants' position, the court notes that the foregoing issues are complex and difficult, and thus present significant issues for appellate review.[17]

---

sidered by the court, whether such objections were timely filed or not. The court further ruled that April 16, 1993, was the deadline for objections, and that it would not consider any objections filed after that date.

The *Tice* action, another case involving preseason claims, was originally filed in the District of Columbia, and transferred to this court by order of Judge Royce C. Lamberth dated February 10, 1993. *Tice v. National Football League*, 812 F.Supp. 255 (D.D.C.1993); *Tice*, Civ. No. 4–93–166 (D.Minn. transferred Feb. 10, 1993). At the preliminary approval hearing, some of the *Tice* plaintiffs objected to the settlement of the preseason pay claims within the context of *White*. Those objections, however, were withdrawn for purposes of final approval of the settlement, although a few players have filed individual objections to the settlement of the preseason pay within the scope of the *White* class action. *See, e.g.,* Letter of Gregory J. Baty dated March 31, 1993 ("the Tice case regarding preseason pay claims should not have been included in any Reggie White settlement").

12. One college player, Brian Pressler, filed a timely objection, purportedly on behalf of himself and all other present and future "college and other football players" similarly situated.

Untimely objections were filed on behalf of college players Jesse Becton, Scott Brown, Rudy Thompson, Ernie Lewis, Eugene Brown, Percy Coleman, James Chinn, Ron Alexander, Brad LaCombe, Dan Purcell, Steve Ross, Ron Moran, Steve Robinson, Garrett Washington and Bennie Hargro.

13. Robert J. Sheridan, who represents the sixteen college player-objectors, filed the objection

purportedly on behalf of himself, and all other present and future agents and attorney-agents similarly situated.

14. The jury awarded the following damages before trebling: Mark Collins, $178,000; Don Majkowski, $0; Tim McDonald, $0; Freeman McNeil, $0; Frank Minnifield, $50,000; Niko Noga, $0; Dave Richards, $240,000; and Lee Rouson, $75,000. *See id.* at *2.

15. By order dated November 11, 1992, the court stayed entry of the *McNeil* judgment pending resolution of various post-trial motions and any appeal. At the time the tentative settlement was reached, various post-trial motions were still pending in *McNeil*.

16. *See McNeil v. National Football League*, 790 F.Supp. 871, 896–97 (D.Minn.1992) (finding that plaintiffs' Plan B claim should be evaluated under the rule of reason).

17. Defendants raised those issues in various post-trial motions on which this court has never ruled, although on January 6, 1993, it was prepared to do so in the event that the parties failed to reach a tentative settlement.

The court previously certified the nonstatutory labor exemption issue to the Eighth Circuit in *McNeil*, finding that there exists a "substantial ground for difference of opinion". *Powell and McNeil*, 764 F.Supp. at 1359 (holding only in *McNeil*); *compare e.g., Powell*, 930 F.2d at 1304 (nonstatutory labor exemption applies as long as the "labor relationship continues"); *with e.g.,*

The nature and extent of damages that plaintiffs or other class members might recover as a result of the operation of Plan B would also be subject to significant uncertainties. In *McNeil,* the only Plan B case tried to date, the jury made clear that such damages are difficult to prove, awarding monetary damages to only four of the eight plaintiffs despite the fact that it found all eight had suffered economic injury as a result of the Plan B rules. *McNeil,* 1992 WL 315292, at *1–2; *see also Jackson v. National Football League,* 802 F.Supp. 226, 231 (D.Minn.1992) (many economic injuries alleged by professional football players "may be impossible to quantify in monetary terms", a difficulty "further confirmed by the jury's [verdict] in *McNeil* "). The court further notes that the *McNeil* plaintiffs proffered substantial evidence to support their damage claims.

Based on the extensive evidence and argument presented during the settlement approval process, as well as the entire records in *Powell, McNeil, Five Smiths, Hilton, Jackson* and *White,* the court has been afforded a comprehensive view of the workings of the NFL and the employment practices of its member clubs, the collective bargaining and labor relations history within the NFL, the nature and effects of the right of first refusal/compensation rules and other player-related rules, the terms of the proposed settlement and the nature and likely effect of the proposed NFL player rules.

Against this background, and for the reasons stated below, the court grants the motions for approval of the Stipulation and Settlement Agreement, overrules all objections to the settlement, grants defendants' motions to enjoin various other cases and denies the motions to intervene except to the extent that various movants shall be permitted to intervene as intervenor-objectors solely for purposes of preserving their right to appeal

the judgment entered by this court in connection with the Stipulation and Settlement Agreement.

## I. PROPER NOTICE WAS GIVEN TO THE CLASS OF THE PROPOSED CLASS CERTIFICATION AND SETTLEMENT

■ 1.1 The court has evaluated whether the proposed settlement is fair, reasonable and adequate using the two-stage procedure suggested in the *Manual for Complex Litigation,* § 30.44, at 241–42 (2d ed. 1985). The first stage involved the court's preliminary determination of whether the proposed settlement was "within the range of possible approval," and whether class members should be notified of the terms of the proposed settlement and the date of a final fairness hearing to determine whether the court should grant final approval. On February 26, 1993, the court determined that the proposed settlement fell within the range of possible approval, and thus the class should be notified of its terms and the date on which the court would conduct a final fairness hearing, April 16, 1993.

The second stage of the court's settlement evaluation process involved sending notice to the class, which described the settlement and allowed class members to file objections to the settlement prior to the final approval hearing. The notice further provided that objectors would have an opportunity to appear and be heard at the final approval hearing.

1.2 As the court previously ruled in its February 26, 1993, order granting preliminary approval, notice of the proposed settlement and of the final approval hearing on April 16, 1993, was proper and adequate as to timing, content and means of transmission.[18]

---

Brown v. Pro Football, Inc., 782 F.Supp. 125, 130–33 (D.D.C.1991) (rejecting Eighth Circuit's holding in *Powell,* and finding that exemption ends when collective bargaining agreement expires); *see Bridgeman v. National Basketball Ass'n,* 675 F.Supp. 960, 964–67 (D.N.J.1987) (rejecting both expiration of collective bargaining agreement and negotiating impasse as point at which exemption terminates, and finding that the exemption continues as long as the employer

"reasonably believes that the challenged practice or a close variant of it will be incorporated in the next collective bargaining agreement").

18. The court rejects the contention, made by the agent representing the sixteen college players, that the notice mailed by plaintiffs differed substantially from that approved by the court. Other than various format changes, the notices were identical.

1.3 Class members were given extensive and proper court-approved notice of the proposed class certification and settlement. The objectors had an adequate and reasonable opportunity to formulate and present meaningful objections to the proposed settlement. In all, nearly five weeks were available for the preparation and filing of objections between preliminary approval of the proposed settlement on February 26, 1993, and the deadline for filing such objections on April 2, 1993. Some four weeks were available between the publication of the Summary Notice in the March 8, 1993, edition of *USA Today*, and the deadline for filing objections. Finally, a full three weeks were available for the preparation and filing of objections between the initial mailing of the Notice of Class Action Settlement on March 12, 1993, and the April 2, 1993 filing deadline.[19]

1.4 With respect to the formal fairness hearing on April 16, 1993, the following notice was given:

(a) On March 12, 1993, court-approved notice of the April 16, 1993, hearing and summary of the terms of the proposed settlement was mailed by first-class mail, postage prepaid, to all persons whom the parties were able to determine, through their best efforts, are class members, and with respect to whom the parties have been able to obtain a current or last-known mailing address.

(b) Court-approved Summary Notice of the April 16, 1993, hearing was also published in the March 8, 1993, edition of *USA*

Today, a daily national newspaper, with a circulation of approximately 1,840,000.

1.5 The court finds that the mailed and published notices clearly satisfy both Rule 23 and due process requirements. Overall, approximately 5,300 notices were mailed to potential class members, including 4,957 notices to current or former NFL players,[20] and 343 notices to graduating college players who attended the NFL's 1993 Rookie Combine in Indianapolis.[21] Of those, a total of 458, or less than ten percent, were returned by the Postal Service as undeliverable. Of the 458 returned notices, 300 were re-mailed to newly located addresses.[22] Mailed notice was directed to the current or last-known addresses of 2,507 of the approximately 2,902 class members (almost eighty-seven percent) entitled to money distributions from the settlement fund. In addition to the Notice of Class Action Settlement, each mailed notice also included an estimate of the settlement payment, if any, that the class member was due to receive. See *Grunin v. International House of Pancakes*, 513 F.2d 114, 121 (8th Cir.) ("individualized notice by mail to the last known address [is] the 'best notice practicable' in a class action contest", *quoting Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174–77, 94 S.Ct. 2140, 2151–52, 40 L.Ed.2d 732 (1974)), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

1.6 The court finds that the mailed and published notices of the April 16, 1993, hear-

---

**19.** Moreover, as previously noted, at the final fairness hearing the court ruled that it would consider all objections filed on or before April 16, 1993.

 In addition, the court contacted all counsel who appeared at that hearing, and permitted them to submit proposed findings by April 23, 1993. The court considered all proposed findings received as of that date, including those filed on behalf of the college player-objectors, the Philadelphia Eagles, Wilber Marshall, the Washington Redskins player-objectors, Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith, Van Waiters, Broderick Thompson, Jerry Ball, Maurice Hurst, John Fourcade, Carl Lee, Mark Dusbabek, Audray McMillian, Felix Wright, Cody Risien, Mark Harper, Sammy Martin, Mike Farr, Pepper Johnson, Don Beebe, Gregory Scales, Brian Blades and Pat Carter.

**20.** Levine Aff. ¶¶ 2–3.

**21.** The court thus rejects Mr. Sheridan's allegation that the NFLPA obstructed notice to college players by refusing to mail out requested copies until March 31, 1993. During the week of March 8, 1993, notices were mailed to 343 top college players who attended the NFL's Rookie Combine in Indianapolis this year. (Berthelsen Supp.Aff. ¶ 22; Quinn Supp.Aff. ¶ 34.) The NFLPA and class counsel promptly mailed notices to all class members who requested a copy. Mr. Sheridan also spent several hours at the NFLPA's offices discussing the terms of the proposed settlement with staff members. (Berthelsen Supp.Aff. ¶ 27.)

**22.** The NFLPA sought to obtain the addresses of all persons whose notices were returned as undeliverable; such efforts included contacting class members' last known representative. (Levine Aff. ¶ 3.)

ing were reasonably calculated, under all of the circumstances of NFL football, to apprise interested parties of the proposed settlement and afford them an opportunity to present their objections. *See, e.g., Reynolds v. National Football League,* 584 F.2d 280, 285 (8th Cir.1978); *Grunin,* 513 F.2d at 120 ("the mechanics of the notice process are left to the discretion of the court subject to the broad 'reasonableness' standards imposed by due process" (citations omitted)). The mailed and published notices fairly, reasonably and adequately conveyed to class members the requisite information concerning the proposed settlement, and afforded a reasonable time in which class members could formulate and file their objections, if any, to the proposed settlement.[23] *See id.* at 121; *cf.* 2 Herbert Newberg & Alda Conte, *Newberg on Class Actions* § 11.57, at 11–140 (3d ed. 1992) ("the period from receipt of notice until the actual settlement hearing is often 30 days or less").

1.7 The Eighth Circuit has further noted that "[c]lass members are not expected to rely on the notices as a complete source of settlement information." *Grunin,* 513 F.2d at 122 (citation omitted). As the notices suggested, class members could, and many did, obtain complete copies of the underlying documents from the court, and obtain further explanation of the proposed settlement from class counsel, the NFLPA, or their own agents or attorneys. *See id.* at 122 (due process does not require that a copy of the entire proposed settlement agreement be included with the mailed notice).

1.8 Moreover, in addition to the court-ordered notice, the NFLPA and class counsel have provided significant additional notice of the settlement to thousands of class members and their representatives. (Berthelsen Supp.Aff. ¶¶ 22–25); *see Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,989, 1977 WL 1497, at *7 (circumstances that increase the effectiveness of published notice to professional football players include "the fact that many class members are represented by agents or attorneys who stay conversant with player-club developments"). Specifically, in early February, the NFLPA mailed information regarding the proposed settlement agreement to 670 player agents who represent approximately ninety-five percent of all NFL players; on March 1, 1993, the NFLPA conducted a seminar concerning the settlement which was attended by approximately 175 of those agents; and on March 9, 1993, the NFLPA mailed all of those agents a copy of the court-ordered notice. (Berthelsen Supp.Aff. ¶ 24.) The NFLPA also conducted numerous meetings with NFL players in which it explained and answered questions concerning the Settlement Agreement. Representatives of the NFLPA have also spoken to hundreds of players and agents on the phone about the proposed settlement. The notice provided directly to class members was thus far broader than that required by the court's order of February 26, 1993.

1.9 Finally, in addition to the notice provided to class members directly by the parties and the NFLPA, the Settlement Agreement has received extensive media coverage, affording class members with substantial additional notice. Immediately after reaching a settlement in principle on January 6, 1993, the parties released a joint press statement setting forth the major points of the parties'

---

**23.** The court also rejects the contention that notice in the present case was inadequate because it was not identical to that provided in *Alexander v. National Football League,* 1977–2 Trade Cas. (CCH) ¶ 61,730, 1977 WL 1497 (D.Minn.1977). When affirming the *Alexander* settlement in *Reynolds,* the Eighth Circuit determined that:

Due process requires that notice of a hearing to review the compromise of a class suit be structured in terms of content in a manner that enables class members rationally to decide whether they should intervene in the settlement proceedings or otherwise make their views known, and if they choose to become actively involved, to have sufficient opportunity to prepare their position.

*Reynolds v. National Football League,* 584 F.2d at 284 (citations omitted).

Applying the *Reynolds* standard to the notice given in the present case, the court finds that it was sufficient to allow class members to rationally determine whether they should either intervene or otherwise object.

Moreover, in *Alexander* there were "approximately 2,060 class members for whom no accurate mailing addresses were available." 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,988, 1977 WL 1497, at *7. Thus, the notice in *Alexander* was arguably inferior to that given in the present action.

agreement. As a result, over the next few days, virtually every major newspaper in the United States printed extensive descriptions of the proposed settlement. Since then, there have been hundreds of newspaper and magazine articles and television and radio reports discussing the settlement. Over the past three and one-half months, there has been nearly daily coverage reviewing the terms and operation of the Settlement Agreement. In *Alexander*, the court recognized that such media coverage increases the effectiveness of the formal notice provided by the parties. 1977–2 Trade Cas. (CCH) ¶ 61,-730, at 72,989, 1977 WL 1497, at *7. As evidence of this, the court noted at the final fairness hearing that at least one objector, Wilber Marshall, filed his objection prior to formal notice being mailed or published.[24] *White*, Transcript of Final Fairness Hearing at 14 (Apr. 16, 1993).

1.10 Based on the foregoing, and all other evidence before the court, the court finds that pursuant to the requirements of Rule 23 and due process, proper notice of the proposed class certification and terms of the settlement was given to class members.

## II. A DEFINABLE CLASS EXISTS THAT SATISFIES THE REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 23(b)(1)

2.1 Federal Rule of Civil Procedure 23(a) explicitly sets forth four prerequisites to class certification: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Two additional implicit requirements of Rule 23(a) are: "(1) the existence of a precisely defined class; and (2) that the class representatives are members of the proposed class." *Powell v. National Football League*, 711 F.Supp. 959, 966 (D.Minn.1989) (citation omitted); *see also In re Worker's Compensation*, 130 F.R.D. 99, 103 (D.Minn.1990); 7A Charles Alan Wright, Arthur R. Miller &

Mary Kay Kane, *Federal Practice and Procedure* §§ 1760–61 (2d ed. 1986).

2.2 In addition to meeting the requirements of Rule 23(a), the proposed class must also satisfy one of the three subsections of Rule 23(b), specifically that:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

2.3 The requirements for class certification are more readily satisfied in the settlement context than when a class has been proposed for the actual conduct of the litigation. *See, e.g., Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 157–58 (S.D.Ohio 1992) ("[t]he rationale behind the loosening of the requirements is to encourage sweeping settlements of complex disputes"); *In re A.H. Robins*, 85 B.R. 373, 378 (Bankr.E.D.Va.1988), *aff'd*, 880 F.2d 709, 738–40 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *see also* 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.28, at 11–57 & n. 142 (3d ed. 1992) (citing *Robins*).

---

**24.** Marshall filed an objection on March 2, 1993.

## A. Definability

■ 2.4 The court determines that in the present case, a definable settlement class exists consisting of: (1) all players who have been, are now, or will be under contract to play professional football for an NFL club at any time from August 31, 1987, to the date of final approval of the settlement of this action; and (2) all college and other football players who have been, are now, or will be eligible to play football as a rookie for an NFL team at any time from August 31, 1987, to the date of final approval of the settlement of this action.

2.5 That class is neither amorphous nor imprecise, and is substantially identical in nature to classes that previously have been certified in cases challenging restraints on competition for player services in professional sports leagues that resulted in analogous class-wide settlements. *See Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,985, 1977 WL 1497, at *2 (D.Minn.1977) (discussing its certification of a class consisting of "all professional football players who have been under contract to one or more NFL clubs at any time from September 17, 1972, to March 1, 1977"), *aff'd sub nom. Reynolds v. National Football League,* 584 F.2d 280, 283–84 (8th Cir.1978) (in addition to damage claims, noting the broad scope of injunctive relief originally sought in *Alexander,* although such relief ultimately became unnecessary when a collective bargaining agreement was reached); *Bridgeman v. National Basketball Ass'n,* Civ. No. 87–4001, slip op. (D.N.J. Apr. 18, 1988); *Robertson v. National Basketball Ass'n,* 389 F.Supp. 867, 900–01 (S.D.N.Y.1975), *aff'd,* 556 F.2d 682, 685 (2d Cir.1977).

2.6 The settlement class is well defined and discrete because all individuals who have been under contract or eligible to play for an NFL team as a rookie since August 31, 1987, are readily identifiable by name. *See Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,989, 1977 WL 1497, at *7 (citing *Robertson,* 389 F.Supp. at 897); *accord Powell,* 711 F.Supp. at 968–69. The court further determines that this prerequisite is not defeated by the inclusion of a well-defined group of players who will enter or become eligible to enter the NFL in the future because the court will be able to determine, at any given time, whether a particular individual is a

member of the *White* class. *Robertson,* 389 F.Supp. at 896–97 ("the fact that fifty to a hundred more [players] may be joining the class does not make it unmanageable"); *cf. Probe v. State Teachers' Retirement Sys.,* 780 F.2d 776, 780 (9th Cir.) ("[t]he fact that [a mandatory] class includes future members does not render the class definition so vague as to preclude certification" (citation omitted)), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986).

## B. Representativeness

2.7 The named plaintiffs were all under contract to an NFL team, and subject to the challenged system of player restraints, during the relevant period. Thus, they are all members of the settlement class they seek to represent.

## C. Numerosity

■ 2.8 As the settlement class consists of more than 5000 persons who are widely dispersed throughout the United States, joinder is impracticable. *Powell,* 711 F.Supp. at 969; *State of Minnesota v. United States Steel Corp.,* 44 F.R.D. 559, 566 (D.Minn.1968) (requirement met where "problems of management and administration would be rendered extremely cumbersome and difficult by joinder of all absentee members"); *Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,989, 1977 WL 1497, at *8.

## D. Commonality

■ 2.9 Commonality "does not require that every question of fact or law be common to every member of the class"; rather, the requirement is met where the questions linking the class members are " 'substantially related to the resolution of the litigation even though the individuals are not identically situated.' " *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561 (8th Cir.1982) (citations and quotation omitted), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *Hedge v. Lyng,* 689 F.Supp. 884, 889–90 (D.Minn.1987) (requirement satisfied where the plaintiff challenged the validity of rules that were common to the class). Differences in the amount of monetary recovery to which particular class members may be entitled

also do not defeat the propriety of class certification of a settlement class. *Alexander*, 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,990, 1977 WL 1497, at *9 ("[u]nder the proposed settlement, members of the class will receive different settlement payments based on certain factors, but this difference in payment will not bar class status"); *Robertson*, 389 F.Supp. at 898 n. 57 (difference in individual settlement damages will not preclude class certification); *cf. Brown v. Pro Football, Inc.*, 146 F.R.D. 1, 2 (rejecting NFL defendants' motion to decertify a player class based on defendants' contention that "all that remains is the individualized issue of damages").

■ 2.10 The claims of each member of the settlement class involve common questions of law and fact. Defendants have imposed various rules "in substantially identical manner to all players within the NFL." *Alexander*, 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,989, 1977 WL 1497, at *8. Thus, each member of the class was, or would have been, subject to the same system of player restraints, which operated to prevent them from freely offering their services to NFL teams in a competitive market. The court therefore determines that the commonality requirement is satisfied. *Id.; Powell*, 711 F.Supp. at 969; *Robertson*, 389 F.Supp. at 898.

### E. *Typicality*

■ 2.11 The claims of the named plaintiffs are typical of the claims of the settlement class. The "typicality" requirement is met " 'if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory.' " *Paxton*, 688 F.2d at 561–62 (quotation omitted); *In re Workers' Compensation*, 130 F.R.D. at 105. In other words, the named plaintiffs must have the same or similar grievances as the members of the class. *Dirks v. Clayton Bro-*

kerage Co., 105 F.R.D. 125, 133 (D.Minn. 1985) (citing *Donaldson v. Pillsbury*, 554 F.2d 825, 830 (8th Cir.), *cert. denied*, 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977)). In the present case, the named plaintiffs and class members either have been, or would have been, subject to the same system of restraints. Thus, all players have a similar interest in altering that existing system. *Robertson*, 389 F.Supp. at 898. Moreover, "the complaint alleges no claims peculiar to the named plaintiffs." *Alexander*, 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,990, 1977 WL 1497, at *8. The court thus concludes that for settlement purposes, the typicality requirement is met. *Id.; Robertson*, 389 F.Supp. at 898; *cf. Powell*, 711 F.Supp. at 969.

### F. *Adequacy Of Representation*

■ 2.12 The purpose of the "adequacy" requirement is to ensure that the class representatives "will vigorously prosecute the interests of the class." *Paxton*, 688 F.2d at 562–63; *In re Workers' Compensation*, 130 F.R.D. at 107. The requirement has two elements: (1) that the class representatives and their counsel will competently and vigorously prosecute the lawsuit; and (2) that the interests of the class representatives are not adverse to those of the class members. *Paxton*, 688 F.2d at 562–63; *In re Workers' Compensation*, 130 F.R.D. at 107.

2.13 The court first finds that plaintiffs' counsel have the experience and competence to provide adequate representation to all class members, as evidenced by their performance on behalf of player plaintiffs in a number of analogous cases, including *Alexander* and *Robertson*,[25] as well as *Powell, McNeil, Hilton, Jackson* and *Five Smiths*, all of which were before this court.[26] *See Alexander*, 1977–2 Trade Cas. (CCH) ¶ 61,-730, at 73,006, 1977 WL 1497, at *32 (noting that prior expertise exists to "a remarkable degree" where counsel served as chief attorney in both *Mackey* and *Alexander*).[27]

**25.** James W. Quinn, class counsel in the present action, as well as counsel in *Powell, Five Smiths, Hilton, McNeil* and *Jackson*, was also class counsel in the *Robertson* litigation.

**26.** The court thus has substantial personal basis on which to judge the experience and competence of class counsel.

**27.** The *Alexander* court was referring to Edward M. Glennon, who was players' counsel in *Mackey*, and was instrumental in settling *Alexander*, the class action arising in the wake of *Mackey*.

Mr. Glennon was also class counsel in *Powell*, players' counsel in *McNeil* and *Jackson*, and class counsel in the present action.

█ 2.14 Several objectors contend, however, that class counsel's loyalty to the class has been compromised as a result of counsel's representation of the NFLPA, as well as individual players, in various other lawsuits. The court concludes, however, that class counsel's participation in other, closely related lawsuits which have been also supported by the NFLPA, does not create any conflict between class counsel and members of the class. In fact, rather than creating conflict, the experience gained thereby was likely a prerequisite to the parties' ultimate agreement to settle. Moreover, the global nature of the settlement reflects the interrelationship of the players' struggle, which was supported both by individual players and the NFLPA. Indeed, two of those actions, *McNeil* and *Jackson*, were crucial to the present class action settlement.[28]

In the *Alexander* class action settlement, the court approved a settlement in which class counsel also functioned as counsel to the NFLPA, finding that such representation did not render class counsel inadequate or impair the negotiated settlement of the various class claims. *Alexander*, 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,990, 73,002, 1977 WL 1497, at *8, *27 (in approving settlement, noting that NFLPA funded both *Alexander* and *Mackey*, and that class counsel also represented the NFLPA).

After presiding over lengthy litigation in which class counsel represented both players and the NFLPA, the court similarly determines that class counsel competently and vigorously represented the interests of both individuals players, as in *McNeil* and *Jackson*, and class members, as in *Powell* and the present action.[29]

2.15 The NFLPA has paid most of class counsel's fees as they have accrued, and class counsel will not seek recovery from the class settlement fund. (Quinn Aff. ¶ 72; Berthelsen Aff. ¶¶ 18–19.) The court therefore rejects any contention that class counsel's interest in recovering attorneys' fees has prevented them from adequately representing the class. *Cf. Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250–51 (S.D.Ohio 1991) (approving attorneys' fees of $5,000,000 where class recovery totalled $56,600,000, and noting that "percentages awarded in common fund cases typically range from 20 to 50 percent of the common fund created").

█ 2.16 Several objectors argue that the class members' interests are adverse because the class is comprised of players in different stages of their careers, contending that there are conflicts between rookies and veterans, and between veterans with different levels of seniority. This, however, is not the type of adversity which precludes class certification. No matter what stage a player is in his career, defendants have imposed various rules "in substantially identical manner to all players within the NFL." *Alexander*, 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,989, 1977 WL 1497, at *8. Moreover, players obviously do not remain at the same level of seniority; as their careers progress, they will all be subject to the same series of rules. Thus, all veteran players were at one time rookies subject to the same college draft, and all veteran players have been subject to either the Plan B right of first refusal/compensation rules, or one of its predecessors. Thus, on numerous occasions, courts have certified settlement classes consisting of all players in a particular sports league. *Id.* at 72,989–92, 1977 WL 1497, at *8–10; *Robertson*, 389 F.Supp. at 896–903; *Powell*, 711 F.Supp. at 966–69.

---

**28.** The court notes that class counsel's handling of various related actions, beginning with *Powell* and continuing through *White*, has been exemplary.

**29.** In his order of February 10, 1993, transferring the *Tice* action to this court, Judge Royce C. Lamberth raised various potential concerns regarding class counsel in the present case. *Tice v. National Football League*, 812 F.Supp. 255 (D.D.C.1993). Class counsel in the present case, however, was only tangentially involved in the *Tice* litigation. The court determines that those concerns never materialized, relying on: arguments and memoranda submitted at the preliminary hearing, this court's substantial experience with class counsel in the present action, as well as in *McNeil, Jackson, Hilton, Five Smiths*, and *Powell*, its determination that class counsel have fairly and adequately represented the entire class, class counsel's termination of its representation of the NFLPA in the licensing litigation, and the withdrawal of plaintiffs and counsel's objections in *Tice*.

2.17 Moreover, no matter what level of seniority, all class members share a common interest in the form and substance of the NFL's player rules, and all class members share a similar interest in the future of the NFL. *Cf. Robertson,* 389 F.Supp. at 899 (even former players were concerned about the National Basketball Association's future). Although the free agency rules set forth in the proposed settlement vary depending on players' seniority, that distinction does not create adverse interests within the class because those rules relate solely to the remedy, not to the subject matter, of the present litigation. *See Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,990, 1977 WL 1497, at *9 (citing *Sperry Rand Corp. v. Larson,* 554 F.2d 868, 874 (8th Cir.1977)). The court further determines that variations in settlement payments based on various factors, such as the length of time a player was restricted under Plan B, do not preclude class treatment. *Id.* (approving class settlement where similar point system resulted in differing class settlement amounts); *Robertson,* 389 F.Supp. at 898 n. 57.

■ 2.18 Various objectors contend that the interests of absent class members have been "sacrificed" in order to secure special benefits for the named plaintiffs. Although the propriety of rewarding named plaintiffs has been "rigorously debated", 2 Herbert Newberg and Alda Conte, *Newberg on Class Actions* § 11.38, at 11–80 (3d ed. 1992), such "preferential treatment . . . must be viewed in the context of [the] litigation." *In re Jackson Lockdown/MCO Cases,* 107 F.R.D. 703, 709 (E.D.Mich.1985). The court must examine the settlement "closely to ensure that the named plaintiffs have fairly represented the interests of the class." *Luevano v. Campbell,* 93 F.R.D. 68, 89 (D.D.C.1981). Courts, however, routinely approve such awards for class representatives who expend special efforts that redound to the benefit of absent class members. *See, e.g., Thornton v. East Texas Motor Freight,* 497 F.2d 416, 420 (6th Cir.1974) (approving greater awards for those who took a more active role in seeking class relief); *Enterprise Energy Corp.,* 137 F.R.D. at 250 (approving class representative "incentive awards" where named plaintiffs took steps to protect interests of class members, thereby effectuating "a Settlement that provides substantial economic and non-economic benefits to the Class Members"); *In re Jackson Lockdown/MCO Cases,* 107 F.R.D. at 710 (approving such award); *Luevano,* 93 F.R.D. at 89; *Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,990, 72,996, 1977 WL 1497, at *9, *17 (distribution of settlement payments based on a point system was "fair and reasonable" and economic interests of named plaintiffs did not conflict with those of absent class members even where "[a]dditional points [we]re awarded to the named plaintiffs"); *cf. Huguley v. General Motors Corp.,* 128 F.R.D. 81, 85 (E.D.Mich.1989) (in case where incentive awards were not objected to, noting that "named plaintiffs and witnesses are entitled to more consideration than class members generally because of the onerous burden of litigation they have borne"), *aff'd,* 925 F.2d 1464 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 304, 116 L.Ed.2d 247 (1991).

Thus, the adequacy of the named plaintiffs' representation is ultimately determined by the terms of the settlement itself. *See, e.g., In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 212 (5th Cir.1981) ("[i]t is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting"). In the present case, and in the related actions funded by the NFLPA, the court finds that the named plaintiffs took substantial risks to step forward. *See infra* ¶ 6.18 & note 45 (detailing defendants' history of retaliating against such players). Many of the named plaintiffs have been involved in litigation for years, and have been deposed or testified at the *McNeil* trial.[30] In light of the comprehensive settlement that has been reached, which will virtu-

---

**30.** Although other named plaintiffs, such as the *White* and *Jackson* named plaintiffs, have been involved for a much shorter period of time, at the time that those players stepped forward, there was no way of knowing that a settlement would be reached so soon after their lawsuits were filed. As one witness testified at the final fairness hearing, last summer one member club stated its willingness to litigate for another ten years. *White,* Transcript of Final Fairness Hearing at 173 (Apr. 16, 1993) (testimony of Randy Vataha). Absent court intervention, that statement may have proven true.

ally restructure the entire league and has already created and will continue to create substantial benefits for all class members, the court concludes that the interests of the named plaintiffs are neither antagonistic nor adverse to the interests of absent class members, and that the preferential treatment of the named plaintiffs is not excessive, but fair and reasonable under such circumstances. *Luevano,* 93 F.R.D. at 89.

2.19 Moreover, "in the settlement context . . . the adequate representation requirement is satisfied when the court determines that the settlement was negotiated at arm's length and was not collusive in favoring the class representative." 2 Herbert Newberg and Alda Conte, *Newberg on Class Actions* § 11.28, at 11–59 (3d ed. 1992); *cf. Jones v. Amalgamated Warbasse Houses,* 97 F.R.D. 355, 359 (E.D.N.Y.1982) (in the absence of evidence of collusion, a "settlement is presumed regular"). After presiding over numerous related cases and participating in the final settlement negotiations in the present action, the court finds that the settlement was clearly negotiated at arm's length and presents no danger of collusion. At least four factors support this finding: the size and complexity of the Agreement and the compromises reflected therein; the context in which it was reached, that is, after five and one-half years of frequently acrimonious litigation; the court's personal knowledge of the negotiators and the tenacity with which they struggled to protect their principals' interests; and the need for the court's involvement in the final stages of the negotiations. *See Robertson,* 389 F.Supp. at 899 ("[t]he four-year history of this litigation is sufficient indication that the named plaintiffs and their counsel will fairly and adequately protect the interests of the class"); *White,* Transcript of Preliminary Approval Hearing at 82–84 (Feb. 26, 1993) (finding no evidence of collusion and concluding settlement was product of arm's length negotiations).

Having determined that the settlement was negotiated in good faith, the court rejects any contention that the preferential treatment of the named plaintiffs jeopardized their ability to adequately represent the class. *Luevano,* 93 F.R.D. at 90 (approving monetary relief for named plaintiffs in settlement in which only a portion of the class

received such relief where "there was no improper collusion").

2.20 Finally, there has been overwhelming class support for the proposed settlement. After extensive notice by mail, by publication and by press coverage of the proceedings, less than two percent of the class members have objected to any phase of the settlement. Out of thousands of class members, only seventy-three active or former players, and sixteen college players, have objected to the proposed class certification and settlement, and most of those objections reflect dissatisfaction with the objectors' personal circumstances. *See Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,990, 1977 WL 1497, at *9 (rejecting claim that named plaintiffs' interests were antagonistic based on overwhelming support by absent class members); *cf. Van Horn v. Trickey,* 840 F.2d 604, 606 (8th Cir.1988) ("a settlement may be approved over a significant percentage of objections from class members" (citation omitted)).

2.21 Based on the foregoing, the court concludes that:

> none of the objectors has introduced any evidence to establish that alleged potential conflicts within the class, or between the named plaintiffs and the absent class members, are real possibilities rather than imaginative speculation. Class action status will not be denied, nor will subclasses be required, absent such a showing.

*Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,991; 1977 WL 1497, at *9 (citing *Robertson,* 389 F.Supp. at 899). The court thus finds that the named representatives adequately represent the class, and denies any request to decertify the class, to form subclasses or to appoint other named plaintiffs or additional class counsel.

### G. *The Need To Avoid Separate Actions*

2.22 Like *Alexander,* the court finds that the present dispute could not be settled solely by an agreement to award class members monetary relief for alleged past liability. To be effective, any settlement must also address the NFL "structural" rules that will

govern players in future years. Thus, a comprehensive agreement or order must encompass such "future rules in order to afford appropriate relief to plaintiffs and to be acceptable to the defendants." *Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,991, 1977 WL 1497, at *10.

■■■ 2.23 As the Eighth Circuit observed when affirming the *Alexander* settlement:

> [t]he need to revise or to eliminate past rules and practices of professional football, [particularly veteran player restraints], plainly encompasse[s] the possibility that adjudications of separate actions could set incompatible standards of conduct for the National Football League.

*Reynolds,* 584 F.2d at 283. If individual players file separate actions seeking injunctive relief against NFL player restraints, there is a substantial risk of inconsistent or varying adjudications which would result in incompatible standards of conduct for the defendants. One court could grant injunctive relief, a second might deny such relief, and a third might grant injunctive relief that materially differs from that granted by the first court. *See Robertson,* 389 F.Supp. at 901. As the district court observed in *Robertson,* such:

> [d]iffering results in the individual actions would impair the [professional sports league's] ability to 'pursue a uniform continuing course of conduct' where pragmatic considerations require that the defendants act in the same manner to all members of the class.

*Id.* (quotation omitted); *cf. National Collegiate Athletic Ass'n v. Board of Regents,* 468 U.S. 85, 101, 104 S.Ct. 2948, 2960, 82 L.Ed.2d 70 (1984) (college football is "an industry in which horizontal restraints on competition are essential if the product is to be available at all"); *Reynolds,* 584 F.2d at 287 (noting in dicta that "[s]ome leveling and balancing rules appear necessary to keep the various [NFL] teams on a competitive basis").

The near certainty of such inconsistency is borne out by the history of litigation between players and the NFL. For example, in *Mackey,* the Eighth Circuit determined that the NFL's interest in maintaining competitive balance between teams should be considered under the rule of reason for purposes of determining whether a veteran player restraint violated the Sherman Act.[31] *Mackey,* 543 F.2d at 619–20. However, in *Smith v. Pro Football, Inc.,* the Court of Appeals for the District of Columbia rejected the competitive balance justification as a matter of law, finding that under the rule of reason, the NFL's interest in maintaining competitive balance, which the NFL argued was a pro-competitive effect, could not be balanced against the anticompetitive effects of the college draft. 593 F.2d 1173, 1186 (D.C.Cir. 1978); *see also Brown v. Pro Football, Inc.,* Civ. No. 90–1071, slip op. at 19–23, 1992 WL 88039, at *9–10 (D.D.C. March 10, 1992) (applying *Smith* and refusing to consider competitive balance when determining whether defendants were liable for fixing the wages of developmental squad players for the 1989 NFL season).

The near certainty of incompatible rules of conduct for defendants is further demonstrated by the current inconsistent case law concerning the scope of the nonstatutory labor exemption. In the *Powell* case, the Eighth Circuit determined that nonstatutory labor exemption protects defendants as long as the "labor relationship continues", but declined to define at what point such relationship ends. 930 F.2d at 1303. A federal district court in the District of Columbia, however, rejected the Eighth Circuit's ruling in *Powell,* and found that the exemption ends when the parties' collective bargaining agreement expires. *Brown v. Pro Football, Inc.,* 782 F.Supp. 125, 129–33 (D.D.C.1991); *cf. Bridgeman v. National Basketball Ass'n,* 675 F.Supp. 960, 964–67 (D.N.J.1987) (rejecting both expiration of collective bargaining agreement and negotiating impasse as point at which exemption terminates, and finding that the exemption continues as long as the employer "reasonably believes that the chal-

---

**31.** Under rule of reason balancing, the "key issue is thus whether [the veteran player restraint] is essential to the maintenance of competitive balance, and is no more restrictive than necessary." *Mackey,* 543 F.2d at 621.

lenged practice or a close variant of it will be incorporated in the next collective bargaining agreement").

Based on the foregoing, the court concludes that class certification is appropriate under Rule 23(b)(1)(A). *See Reynolds*, 584 F.2d at 283 (finding that certification of a 23(b)(1) class is appropriate in cases involving antitrust challenges to a system of player restraints because "[a]ntitrust violations involving the rules and practices governing professional players may require the imposition of broadly based remedies").

The court further concludes that the prosecution of separate actions by individual players would create the risk of judgments that may, as a practical matter, affect the rights of class members and impair their ability to protect their interests. As the court observed in *Alexander:*

> such risks are illustrated by the attempt of one objector to initiate a separate suit challenging the agreed-to structural rules and seeking injunctive relief in another forum.

1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,991, 1977 WL 1497, at *11. The numerous lawsuits already filed by various class members seeking injunctive relief clearly demonstrate that such risks are also present in the instant case. *See, e.g., Hurst v. National Football League,* Civ. No. 92–3263 (E.D.La. filed Oct. 1, 1992); *Sanders v. National Football League,* No. 92–4365 (C.D.Cal. filed July 23, 1992). Accordingly, the court determines that certification is also appropriate under Rule 23(b)(1)(B). *Powell,* 711 F.Supp. at 969; *Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,-730, at 72,991, 1977 WL 1497, at *11; *Robertson,* 389 F.Supp. at 901.

2.24 Although the present class would also satisfy the requirements for certification under Rule 23(b)(3), the court determines that the class should be certified exclusively under Rule 23(b)(1). As numerous courts have held, when there is a choice between (b)(1) and (b)(3) certification, it is proper to proceed under (b)(1) exclusively in order to further the policies underlying (b)(1) class actions, that is, to avoid inconsistent adjudications or the compromise of class interests which otherwise would occur as a result of class members' ability to opt out under a (b)(3) class. *See, e.g., Reynolds,* 584 F.2d at 284; *Robertson,* 556 F.2d at 685; *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1340 (9th Cir.1976); *Specialty Cabinets & Fixtures v. American Equitable Life Ins. Co.,* 140 F.R.D. 474, 477 (S.D.Ga. 1991); *Powell,* 711 F.Supp. at 969; *Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,991–92, 1977 WL 1497, at *11. In such cases, certification of a mandatory class is preferred because:

> n Rule 23(b)(3) opt-out classes ... absent class members are connected with one another [solely] because their claims involve common questions. By contrast, no opt-out classes satisfying Rule 23(b)(1) or (2) were designed specifically to avoid the risks of inconsistency, prejudice, or inequity that would result to persons similarly situated in the absence of a unitary adjudication of their common claims.... [Thus] the protection of the rights of class members in [no opt-out] classes ... is much more interdependent with resolution of the rights of others similarly situated than is the case for [23(b)(3)] class members....

1 Herbert Newberg & Alda Conte, *Newberg on Class Actions* § 1.20, at 1–48 (3d ed. 1992).

In the present action, the claims of class members are not connected solely because they involve common questions, but rather because they arise from a system of player rules that have been uniformly imposed on all professional football players. *See Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,989, 1977 WL 1497, at *8 (defendants have imposed various rules "in substantially identical manner to all players within the NFL").[32] The court therefore finds that class certification under Rule 23(b)(1) is more appropriate than under Rule 23(b)(3) because

---

**32.** As a result of this identity of interest, in *McNeil,* the court determined that all eight plaintiffs, if injured, suffered from the same antitrust injury, that is, the inability to compete in the relevant market for professional football players' services. *See McNeil,* Civ. No. 4–90–476, 1992 WL 315292, at *1 (D.Minn. Sept. 10, 1992) (Question 4 of the special verdict form, which

it effectuates the policies underlying such mandatory class actions.

2.25 For the foregoing reasons, the court concludes that a definable class exists that satisfies the requirements of, and should be finally certified pursuant to, Federal Rule of Civil Procedure 23(b)(1).

## III. DUE PROCESS DOES NOT RE-QUIRE THAT ABSENT CLASS MEMBERS BE GIVEN OPT-OUT RIGHTS

3.1 Opt-out rights are not required in actions involving classes properly certified pursuant to Rule 23(b)(1). *See* Fed.R.Civ.P. 23(b)(1), (c)(2).

3.2 A number of objectors have argued that, under the Supreme Court's decision in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) and its progeny, minimum due process requires that absent class members be afforded an opportunity to opt out of all class actions that involve claims for money damages. The court finds, however, that there is little support for such a broad interpretation of *Shutts*.

(a) The Supreme Court's decision in *Shutts* does not purport to make every mandatory non-opt-out class action unconstitutional. In *Shutts*, the Supreme Court determined that where a class action concerns claims "wholly or predominantly for money judgments", absent class members must be given notice, an opportunity to oppose the class settlement and an opportunity to opt out. 472 U.S. at 811–12 & n. 3, 105 S.Ct. at 2974–75 & n. 3. The Supreme Court, however, did not address class actions in which the claims for injunctive relief plainly predominate, and specifically stated that its holding was:

> required the jury to determine plaintiffs' economic injury collectively rather than individually); *id.* at *5 (Jury Instruction No. 29, setting forth antitrust injury alleged by plaintiffs).

**33.** The latter three cases all address the question of whether classes were properly certified under Rule 23(b)(2), which permits class actions involving both injunctive and monetary damages only in situations where the money damages are "merely incidental to the[ ] primary claim for injunctive relief." *Probe*, 780 F.2d at 780; *see* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*

limited to those class actions which seek to bind known plaintiffs concerning claims wholly or predominantly for money judgments. We intimate no view concerning other types of class actions....

*Id.* at 811 n. 3, 105 S.Ct. at 2974 n. 3; *see also In re Jackson Lockdown/MCO Cases*, 107 F.R.D. at 713–14; 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1789, at 255 (2d ed. 1986) (noting Supreme Court's explicit limitation); 1 Herbert Newberg & Alda Conte, *Newberg on Class Actions* § 1.19, at 1–48 (3d ed. 1992) (*Shutts* was silent concerning the validity of classes certified under Rule 23(b)(1) and "[i]t is highly unlikely that the Supreme Court would have invalidated [that] rule[ ] without expressly doing so").

▬ (b) The court thus concludes that even where a class action involves claims for money damages, mandatory non-opt-out class certification remains proper as long as the class claims for equitable or injunctive relief predominate· over the claims for damages. *In re Jackson Lockdown/MCO Cases*, 107 F.R.D. at 713–14; (distinguishing *Shutts* for purposes of certifying class action involving claims for monetary relief under Rule 23(b)(1)); *cf. Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776, 780 (9th Cir.) (analyzing whether money damages are incidental to primary claim for injunctive relief for purposes of determining whether certification was proper under Rule 23(b)(2)), *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986); *Williams v. Lane*, 129 F.R.D. 636, 639–43 (N.D.Ill.1990) (same); *Lloyd v. City of Philadelphia*, 121 F.R.D. 246, 251 (E.D.Pa.1988) (class certified under Rule 23(b)(1)(B) and (b)(2)).[33]

> § 1775, at 463 (2d ed. 1986) ("a suit predominantly seeking money damages would not qualify under this portion of the rule").

As previously discussed, in *Shutts*, the Supreme Court adopted virtually the same test for purposes of determining whether absent class members have a constitutional right to opt out of a mandatory class, that is, whether a class is "wholly or predominantly for money judgments". 472 U.S. at 811 n. 3, 105 S.Ct. at 2974 n. 3. In addition, the purposes underlying (b)(1) and (b)(2) class actions are the same: "to avoid the risks of inconsistency, prejudice, or inequity

**■** (c) The court further rejects the contention of various objectors that mandatory non-opt-out class actions that include claims for money damages are confined solely to "limited fund" cases. Mandatory non-opt-out classes under Rule 23(b)(1) may also be certified in cases involving claims for money damages in which no "limited fund" exists. *See, e.g., Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 67 (S.D.Ohio 1991); *Specialty Cabinets & Fixtures*, 140 F.R.D. at 477 (although the most common use, "limited fund cases are not the only cases certified under this subsection"). Similarly, courts routinely certify mandatory non-opt-out classes under Rule 23(b)(2) in cases involving hybrid claims for injunctive relief and damages, even in the absence of a "limited fund." *Probe*, 780 F.2d at 780; *Lloyd*, 121 F.R.D. at 251.

**■** 3.3 The factual circumstances of this case, and its predecessors, confirm that it is a case in which the plaintiff class's claims for structural, injunctive relief "predominate" over its claims for damages. In reaching this conclusion, the court relies on the following:

(a) The repeated motions for preliminary and permanent injunctive relief filed by the plaintiffs in *Powell, McNeil, Jackson,* and *White.* Indeed, the original complaint in the present action sought *only* injunctive relief.

Moreover, as previously discussed, class members' claims are interrelated because players are subject to a uniform system of player rules; therefore there is a significant identity of interest between class members for purposes of analyzing their economic injuries. *See supra* note 32. To provide a meaningful class remedy, any injuries must be redressed primarily through broad injunctive relief. In the absence of such relief, any award of monetary damages would merely be a stopgap measure, insufficient to prevent the reoccurrence of such injuries while likely

generating an unending procession of lawsuits.

(b) The entire record of the *McNeil* trial, and in particular, the testimony of the eight player-plaintiffs. For example, Freeman McNeil, the lead plaintiff in the *McNeil* case, testified at trial that his primary purpose in filing the *McNeil* lawsuit was *not* to recover money damages, but rather "[w]hat I'm suing for is the right to be able to make a choice in my life with what I do." *McNeil* Trial Transcript at 922.[34]

(c) The repeated representations of class counsel and other player representatives, both before and after the parties had reached a tentative agreement to settle, that these lawsuits primarily sought either the elimination or the substantial modification of various NFL rules regarding player movement and employment. For instance, at the preliminary approval hearing, class counsel stated "that the essence of what the players have been seeking through all of this litigation has been a change in the overall system, a change in the industry-wide rules that have affected the terms and conditions of their employment." *White*, Transcript of Preliminary Approval Hearing at 19 (Feb. 26, 1993).

(d) The statements made by defendants and their representatives to the same effect. *See* Declaration of Paul Tagliabue ¶¶ 18, 27 (dated Feb. 22, 1993).

(e) The terms of the Stipulation and Settlement Agreement itself, which devotes 179 pages of the 188–page document to redefining the rules and practices governing player employment in the NFL.

**■** 3.4 In cases where sufficient alternative procedural safeguards are employed, opt-out rights are *not* constitutionally required. *See, e.g., Williams v. Burlington*

---

that would result to persons similarly situated in the absence of a unitary adjudication of their common claims". 1 Herbert Newberg & Alda Conte, *Newberg on Class Actions* § 1.20, at 1–48 (3d ed. 1992). The court thus concludes that the cited Rule 23(b)(2) cases are instructive for purposes of determining whether a class action is properly considered as one "predominantly for money judgments."

The court further rejects any claim that Rule 23(b)(2) cases are inapposite because such class actions are confined to civil rights claims. *See,*

*e.g., id.* § 4.12, at 4–40 ("[t]he Advisory Committee Notes to Rule 23 emphasize that subdivision (b)(2) is not limited to civil rights cases", and the Note explicitly cites "price discrimination by wholesalers against a class of retailers and tying violations by patentees as examples in which Rule 23(b)(2) class actions could be used in antitrust cases").

**34.** The court also noted McNeil's testimony during the final fairness hearing. *White*, Transcript of Final Fairness Hearing at 46 (Apr. 16, 1993).

*Northern, Inc.,* 832 F.2d 100, 104 (7th Cir. 1987) (even though plaintiff did not have right to opt out, court "provided [plaintiff] with the equivalent due process protection that would be accorded to a Rule (23)(b)(3) class member"), *cert. denied,* 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988); *cf. Robertson,* 556 F.2d at 685–86 (discussing due process rights of mandatory class members prior to *Shutts* ). Moreover:

> [b]ecause the protection of the rights of class members in classes certified under Rule 23(b)(1) or (2) is much more interdependent with resolution of the rights of others similarly situated than is the case for [23(b)(3) ] class members connected only because their claims involve common questions, it is probable that individual procedural due process rights involving minimum contacts with the forum will not be imposed on these more cohesive, interdependent class actions, when they were not required in more discretionary common question class actions.

1 Herbert Newberg & Alda Conte, *Newberg on Class Actions* § 1.20, at 1–48 (3d ed. 1992) (discussing impact of *Shutts* ). Even though class members in the present case may not opt out, the court concludes that the requirements of due process have been satisfied because the objectors have been: (1) adequately represented by the named plaintiffs; (2) adequately represented by capable and experienced class counsel; (3) provided with adequate notice of the proposed settlement; (4) given an opportunity to object to the settlement; and (5) assured that the settlement will not be approved unless the court, after analyzing the facts and law of the case and considering all objections to the proposed settlement, determines it to be fair, reasonable and adequate. *See, e.g., Williams,* 832 F.2d at 104; *Nottingham Partners v. Dana,* 564 A.2d 1089, 1100–01 (Del.1989).

3.5 The court determines that the Ninth Circuit's recent decision in *Brown v. Ticor Title Ins. Co.,* 982 F.2d 386 (9th Cir.1992), is not to the contrary. The *Brown* case does not alter the constitutional standards articulated in *Shutts* and, in fact, expressly recognizes that *"Shutts* is limited to claims 'wholly or predominantly for money judgments.'" *Id.* at 392 (quoting *Shutts,* 472 U.S. at 811 n.

3, 105 S.Ct. at 2974 n. 3). At most, *Brown* stands for the proposition that where a class action involves claims "wholly or predominantly" for money damages, and where the settlement of such class action accords *only* injunctive relief and *no* damage recovery, an absent nonresident class member's later claim for damages will not be barred.

The court concludes that *Brown* has no application to the present case because: (1) the plaintiff class' claims are predominantly injunctive in nature, and (2) the relief provided for by the terms of the settlement, although predominantly injunctive, also includes substantial payments to settle the damages claims of the individual players.

3.6 Accordingly, the court concludes that due process does not require that absent class members be afforded an opportunity to opt out of the *White* class settlement.

## IV. SUMMARY OF THE TERMS OF THE PROPOSED SETTLEMENT

### A. *Structural Relief*

4.1 *Free Agency.* The following is a brief summary of the principal provisions of the Stipulation and Settlement Agreement relating to veteran free agency.

(a) The settlement provides that, except for the few "Franchise" and "Transition" players to whom special rules apply, all players with at least five years of NFL experience whose contracts have expired may negotiate and enter into contracts with NFL teams as unrestricted free agents during a "signing period" extending from contract expiration, on or about March 1st, through approximately July 15th, of each year. In the event that the contingent salary cap provision, discussed *infra* ¶¶ 4.3–.5, is in effect, the Agreement provides for free agency after four rather than five years of experience.

(b) Players with three or four years of experience whose contracts have expired may be subject to certain rights of first refusal ("RFR") by their existing team-employer, and if the player moves to a new team, his new employer may have to give draft rights as compensation to the player's former team; however, such rights cannot be invoked unless the former team has tendered

the player a substantial contract offer. The scope of such rights also varies depending on the amount of the offer: in general, the higher the offer, the greater the rights acquired. Moreover, in the event that NFL revenues increase from one year to the next, the amounts of those requisite tender offers are to increase at the same rate, up to a maximum of ten percent per year.

(c) Players with less than three years of experience are subject to their former teams' exclusive negotiating rights, provided that they are offered salaries of at least $100,000 for players with less than one year of experience, $125,000 for players with one year of experience and $150,000 for players with two years of experience. In the event that NFL revenues increase from one year to the next, those minimums are to increase at the same rate, up to a maximum of ten percent per year.

(d) All veteran players are governed by the above free agency rules except those who are designated "Franchise" or "Transition" players. In any year, each team is permitted to designate one Franchise Player by tendering an offer of a one year contract at a salary amounting to the greater of (1) the average of the salaries of the five highest paid players at the designated player's same position, or (2) a twenty percent increase in the designated player's previous year's salary. A team thereby obtains exclusive negotiating rights to the Franchise Player, notwithstanding his years of experience.

(e) In the first year of the Agreement, each team may designate two, and, in both the second and final year of the Settlement Agreement, one, Transition Player(s) by tendering an offer of a one year contract at a salary amounting to the greater of (1) the average of the salaries of the ten highest paid players at the designated player's same position, or (2) a twenty percent increase in the designated player's previous year's salary. A team thereby obtains a RFR with respect to the transition player, notwithstanding his years of experience.

(f) In years when there is no salary cap in effect, the four teams in the previous season's conference championship games are not permitted to sign unrestricted free agents from other teams. The next four runner-up teams in the playoffs can sign one unrestricted free agent from another team at a salary of $1.5 million or more per year, and an unlimited number at less than $1 million. In the event of an increase in NFL revenues, those amounts are to increase at the same rate. Notwithstanding the above, those eight teams can replace their own free agents who have moved to other teams, and pay any such replacement player up to the amount the departed free agent is receiving from his new team.

4.2 *College Draft.* Under the terms of the Stipulation and Settlement Agreement, the NFL college player draft consisted of eight rounds this year, and will be seven rounds thereafter, substantially fewer than the prior twelve round draft. In addition to the seven rounds of the draft, there may also be up to twenty-eight "compensatory" draft picks per year for teams losing certain free agents. Teams obtain exclusive negotiating rights to their rookie draftees through a tender at the minimum active-list salary (initially $100,000). All players who were eligible to be drafted, but were not chosen, are free to negotiate with any team of their choosing.

4.3 *Salary Cap.* If in any season the league-wide total of player costs rises to sixty-seven percent of Defined Gross Revenues ("DGR"), as that term is defined in the Stipulation and Settlement Agreement, the salary cap provisions are triggered, and the cap will go into effect in the following season. If in effect, the salary cap will limit the percentage of DGR that can be expended on player costs as follows: in the first "capped" year, total league-wide player costs may not exceed sixty-four percent of DGR; in the second year sixty-three percent; in the third year sixty-two percent; and in subsequent years sixty-two percent; subject to certain cap adjustment and removal provisions. The cap is to be equally allocated among the teams. Once triggered, the total dollar amount of the cap cannot go down from one year to the next, subject to a maximum cap of seventy percent of DGR. There is to be no salary cap in 1999, the final year of the Agreement.

4.4 *League and Team Guarantees.* Minimum salary guarantees will come into effect simultaneously with the triggering of the salary cap. Such guarantees will require that league-wide player costs amount to at least fifty-eight percent of DGR, and that each team's player costs amount to at least fifty percent of its own share of DGR. Any shortfall on those guarantees will be paid out immediately at the end of each season to affected players on a league-wide or per-team basis, as appropriate.

4.5 *Salary Cap "Lift Off".* If, after the cap is triggered, league-wide player costs drop below fifty-nine percent of DGR, the next year's cap is increased by one percent; if below fifty-eight percent, the cap is increased by two percent; if below fifty-seven percent, the cap is increased by three percent; and if below fifty-six percent, the cap is lifted entirely, subject again to the sixty-seven percent trigger.

4.6 *Entering Player Pool.* Under the terms of the Stipulation and Settlement Agreement, the salaries of rookie players are not to exceed the higher of: (1) 3.5% of DGR, (ii) $2 million times the number of teams in the league, or (iii) the previous year's pool. That amount, which cannot decrease from year to year, currently equals approximately the average, over the past three years, of the amount that has been expended on salaries of all draftees in the first eight rounds. The amount available to each team for rookie draftees will vary depending on several factors, including order in the draft, traded draft picks and compensatory picks. Incoming drafted rookies will negotiate their salaries individually within the pool. The salaries of undrafted rookies do not come out of the pool except to the extent that they exceed the minimum active-list salary applicable to such players.

4.7 *Anti-Collusion Provisions.* The Stipulation and Settlement Agreement also contains various anti-collusion provisions which prohibit the NFL and any NFL member team from agreeing with any other team regarding: (1) the decision to negotiate or not negotiate with any player; (2) the decision to submit or not submit an offer sheet to any restricted free agent; (3) the decision to offer or not offer a contract to any player; (4) the decision to exercise or not exercise a right of first refusal; or (5) the terms or conditions of employment offered to any individual player for inclusion in a player contract. In addition, an expedited and comprehensive enforcement mechanism has been created to deter and punish any collusion violations.

4.8 *Court Supervision.* The court will retain jurisdiction over the enforcement of the Settlement Agreement through appointment of a special master, who will hear disputes on an expedited basis, subject to review by the court.

### B. *Monetary Relief*

4.9 The Stipulation and Settlement Agreement also provides monetary relief to the plaintiff class. Specifically, the defendants are to pay approximately $115 million for distribution to class members in the *White* case. In addition, as set forth below, another $80 million in monetary relief and reimbursement of costs will be paid to players and the NFLPA by the NFL defendants in settlement of this and other related litigation. Of the $195 million total amount to be paid by the NFL, approximately $97 million will be paid this year and the remaining $98 million will be paid in five annual installments through 1998.

4.10 The $115 million *White* settlement fund is to be allocated pursuant to the following plan:

(a) Class members with claims for damages resulting from Plan B and accompanying player restraints will be assigned points in accordance with the formula set forth below. The value of a point will be determined by dividing the sum of $110 million by the total number of points assigned. Points will be assigned as follows:

— Players who entered new contracts after being protected under Plan B in 1990, 1991, or 1992 will receive 1 point for each year in which they continue to be restricted while playing under such a contract.

— Players who renegotiated and/or extended contracts prior to being protected under Plan B in 1990, 1991, or 1992 will receive ½ point for each year in which

they continue to be restricted while playing under such a contract.

—Players who entered new contracts after being protected under Plan B in 1989 will receive ½ point for each year in which they continue to be restricted while playing under such contract.

—Players who renegotiated and/or extended contracts prior to being protected under Plan B in 1989 will receive ¼ point for each year in which they continue to be restricted while playing under such a contract.

(b) The named plaintiffs in the *White* case will not receive any points for contracts entered into while protected in 1990, 1991, and/or 1992, but will instead receive the following amounts: Reggie White—$0; Michael Buck—$134,805; Vann McElroy—$470,194; Hardy Nickerson—$494,836. Those amounts represent the damages, before trebling, that they would have sought at trial were they to use the methodology for estimating damages developed and relied upon by Michael Glassman, the plaintiffs' expert economist in the *McNeil* case, as adjusted to apply to the facts of each player. In addition, Reggie White will receive 1½ points because he entered into a three-year contract extension in 1990 before being protected in that year, and Hardy Nickerson will receive 1 point because he entered into a two-year contract extension in 1990 before being protected in that year.

(c) The named plaintiffs in the *Lewis* case, which has been consolidated with *White*, will not receive any points for contracts entered into in 1989, but will instead receive the following amounts for their damage claims arising in that year: Albert Lewis—$711,600; Wayne Radloff—$214,115. Those amounts represent the damages, before trebling, that they would have sought at trial were they to use the Glassman methodology.

(d) Individual plaintiffs in the related player lawsuits that are being settled concurrently with the class action are not to receive any points for claims in those cases that are coextensive with any claims that they may have in the *White* class action.

(e) Class members with claims for deprivation of preseason pay will be assigned points in accordance with the following formula. The value of a preseason pay point will be determined by dividing the sum of $5 million by the total number of points assigned. Class members will receive one tenth of one preseason pay point for each hundred dollars, or fraction thereof, of their claims. The amount of each player's "claim" is equal to the amount he was entitled to earn under Paragraph 6 of his NFL Player Contract minus whatever amount he was actually paid by his team prior to being cut in the preseason period.

(f) As in *White, Lewis,* and the individual player cases, the named plaintiff for the preseason pay claims, Dave Duerson, will not receive any preseason pay points but will instead receive the sum of $98,302, which is the amount of damages, before trebling, that he would have sought at trial were he to use the Glassman methodology.

## C. *Settlement of Related Litigation*

4.11 The class action settlement described above is one part of a broader global settlement of a host of other litigation between players and defendants. The class action settlement could not have been reached without the concurrent resolution of those other matters, because it is the objective of both the class and of the NFL to lay a firm foundation for peace for years to come. Beyond this overarching benefit, the global settlement provides a number of additional significant benefits to class members as described below.

4.12 *Back Pay.* The back pay case, *NFLPA v. NFL Management Council,* was filed shortly after the end of the 1987 strike on behalf of all striking players and alleges that the NFL had wrongfully deprived all returning strikers of one week's pay by preventing them from returning to work for one week despite the fact that the players were ready, willing and able to do so. That case is to be settled in consideration of payment by the NFL defendants to the striking players, all of whom are *White* class members, of approximately $30 million.

4.13 *Licensing Litigation. NFLPA v. NFL Properties, Inc.,* No. 90–CV–4244 (S.D.N.Y.), was filed on June 25, 1990, by the NFLPA, seeking damages for antitrust violations and tortious interference with existing

NFLPA group licensing authorizations. That lawsuit is to be settled in consideration of the NFL defendants' agreement (i) to pay the plaintiff NFLPA $10 million; (ii) to sublicense certain of the contested players' rights back to the plaintiff NFLPA; and (iii) to assign to the NFLPA certain licensing agreements with manufacturers that had licensed players' rights from NFL Properties. The $10 million fund will be distributed by the NFLPA to all NFLPA members who signed and honored their group licensing authorizations. The beneficiaries of that settlement are also *White* class members. In addition, as a direct result of the global settlement, seven other licensing related cases between and among the NFLPA, NFL Properties, various individual players, and various NFLPA and NFL Properties' licensees will be settled.[35]

4.14 *Preexisting Individual Lawsuits.* There are a number of individual player lawsuits, all funded by the NFLPA, which predate the filing of the *White* class action and challenge the Plan B rules and various other alleged unlawful practices by the NFL relating to the terms and conditions of player employment.[36] Those cases are to be settled separately, and the plaintiffs therein will not participate in the class settlement fund to the extent that their claims in such cases are coextensive with claims that they might have made in the *White* class action. For example, the eight *McNeil* plaintiffs will not receive any points for 1990 or 1991, the years for which they sought damages in their individual complaint, but will receive points, if eligible, for 1989 and 1992 as class members. The total consideration to be paid by the NFL defendants for the settlement of those preexisting cases is approximately $19,028,-628.

**35.** Those cases are: *NFLPA v. Roby,* Case No. 92–09092(15) (Cir. Ct. Broward Cty. Fla.); *NFLPA v. Carrier,* Case No. 92 CH 3281 (Cir. Ct. Cook Cty. Ill.); *NFLPA v. Fulcher,* Case No. 92–CI–00604 (Kenton Cir. Ct. Ky.); *NFLPA v. Clayborn,* Docket No. 92–00984 (Norfolk Sup.Ct. Mass.); *NFLPA v. Golic,* Docket No. C123–92 (Sup.Ct. Bergen Cty. N.J.); *NFL Properties, Inc. v. Hi Pro Marketing,* No. 92 Civ. 1456 (S.D.N.Y.); and *Aikman v. AAA Sports,* No. 92 Civ. 1457 (S.D.N.Y.).

**36.** Those cases are: *McNeil v. National Football League,* Civ. No. 4–90–476 (D.Minn.); *Jackson v.*

## D. *Attorneys' Fees, Costs, and Disbursements*

4.15 No legal costs are to be paid out of the settlement fund. However, as part of the global settlement, defendants have agreed to reimburse the NFLPA for attorneys' fees, costs, and disbursements, in the amount of approximately $18,847,520, incurred in connection with its financing, prosecution, and defense of the *White* class action and the other lawsuits that are concurrently being settled.

## V. STANDARD FOR COURT EVALUATION OF THE STIPULATION AND SETTLEMENT AGREEMENT

■ 5.1 The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context. *Armstrong v. Board of Sch. Directors,* 616 F.2d 305, 312–13 (7th Cir.1980); *Holden v. Burlington Northern, Inc.,* 665 F.Supp. 1398, 1405 (D.Minn. 1987). Settlement of the complex disputes often involved in class actions minimizes the substantial burdens to the parties and to scarce judicial resources that such litigation entails. *Armstrong,* 616 F.2d at 313.

■ 5.2 Notwithstanding the strong policy favoring settlement, Federal Rule of Civil Procedure 23(e) provides that a class action may not be dismissed or compromised without court approval. Under this rule, the court has a duty to protect the rights of absent class members as well as the interests of the named plaintiffs. *Grunin,* 513 F.2d at 123; *Welsch v. Gardebring,* 667 F.Supp. 1284, 1289 (D.Minn.1987).

*National Football League,* 802 F.Supp. 226 (D.Minn.); *Joyner v. National Football League,* Civ. No. 92–2876 (E.D.Pa.); *Allen v. Chargers Football Co.,* Civ. No. 91–4322 (C.D.Cal.); *Hebert v. National Football League,* Civ. S023456 (Sup. Ct.Cal.); *Solomon v. National Football League,* No. 92–1244 (Tex. Dist.Ct.); *Morris v. New York Giants, Inc.,* (Arbitration before Hon. Bernard S. Meyer); *Chandler v. Indianapolis Colts, Inc.,* Civ. No. 54601–9009–CP–0453 (Ind.Cir.Ct.); *Mullin v. Los Angeles Rams Football Co.,* No. B063729 (Cal.Ct.App.); and *Tice v. Pro Football, Inc.,* Civ. No. 4–93–169 (D.Minn.).

5.3 In evaluating a class action settlement pursuant to Rule 23(e), the district court's primary responsibility is to ensure that the settlement is "fair, reasonable, and adequate." *Van Horn v. Trickey,* 840 F.2d 604, 606 (8th Cir.1988) (citing *Grunin,* 513 F.2d at 123); *In re Flight Transp. Corp. Sec. Litig.,* 730 F.2d 1128, 1135 (8th Cir.1984), *cert. denied,* 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985).

5.4 Such a determination is committed to the discretion of the trial judge, and will not be overturned except on a showing that the district court clearly abused its discretion. *Wiener v. Roth,* 791 F.2d 661, 662 (8th Cir.1986); *Reynolds,* 584 F.2d at 283; *Grunin,* 513 F.2d at 123. Great weight is accorded the trial court's views:

> 'because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.'

*Reynolds,* 584 F.2d at 283 (quoting *Grunin,* 513 F.2d at 123 (quotation omitted)).

5.5 In evaluating the fairness, reasonableness and adequacy of the proposed settlement, the court is to consider various factors, the most important of which is the strength of plaintiffs' case on the merits balanced against the benefits to the class provided by the settlement. *Van Horn,* 840 F.2d at 607; *Grunin,* 513 F.2d at 124; *Holden,* 665 F.Supp. at 1407. Other important factors include:

> 1) the opinions of the participants, including class counsel, class representatives, and class members; 2) the complexity, expense, and likely duration of further litigation; 3) the extent of discovery completed and the stage of the proceedings; and 4) the evidence, if any, that the proposed settlement is the product of fraud and collusion.

*Holden,* 665 F.Supp. at 1407 (citations omitted); *accord Armstrong,* 616 F.2d at 314; *Grunin,* 513 F.2d at 124; *Welsch,* 667 F.Supp. at 1290.

5.6 Moreover, in evaluating the settlement;

the court does not have the responsibility of trying the case or ruling on the merits of the matters resolved by agreement. *Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,-730, at 72,993, 1977 WL 1497, at *12. Rather, "'the very purpose of compromise is to avoid the delay and expense of such a trial.'" *Id.* (quoting *Grunin,* 513 F.2d at 124). The court's ultimate responsibility is to determine whether the settlement as a whole "'is so unfair as to preclude judicial approval.'" *Id.* (quoting *Robertson v. National Basketball Ass'n,* 72 F.R.D. 64, 68 (S.D.N.Y.1976), *aff'd,* 556 F.2d 682 (2d Cir.1977)).

5.7 Finally, where, as here, the settlement of class claims includes a lump sum payment, the court must also approve of a plan for allocating the settlement proceeds to class members. *See Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,996; 1977 WL 1497, at *17; 3 Herbert Newberg & Alda Conte, *Newberg on Class Actions* § 12.-35, at 12–76 (3d ed. 1992).

## VI. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A. The Strengths of Plaintiffs' Case Balanced Against the Benefits of the Settlement

6.1 In weighing the strength of plaintiffs' case against the benefits provided by the proposed settlement, the court:

> cannot be expected to balance the scales with the nicety of an apothecary. The very object of compromise 'is to avoid the determination of sharply contested and dubious issues.'

*Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,-730, at 72,993, 1977 WL 1497, at *12 (quoting *Young v. Katz,* 447 F.2d 431, 433 (5th Cir. 1971)). Thus, the court's determination generally will not go beyond "an amalgam of delicate balancing, gross approximation, and rough justice." *Welsch,* 667 F.Supp. at 1290 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 468 (2d Cir.1974)).

6.2 *The Risks of Further Litigation.* Plaintiffs face numerous risks and uncertainties in going forward with this litigation. Those risks include the following:

(a) Despite the verdict in the *McNeil* case, the establishment of defendants' liability for the imposition of the right of first refusal/compensation rules of Plan B is still subject to appeal. Defendants have indicated their intent to appeal the *McNeil* judgment on a number of grounds, including the applicability of the nonstatutory labor exemption, defendants' alleged incapacity as a "single entity" to enter into an antitrust conspiracy, the proper application of the rule of reason under Section 1 of the Sherman Act, and the "fact of injury" element of liability in a private antitrust action. Should the *McNeil* judgment be overturned on one or more of those grounds, plaintiffs would at best be faced with the prospect of retrying, at great expense and after substantial delay, the issue of liability. At worst, if defendants were to prevail on issues such as the labor exemption or the single entity defense, plaintiffs might be entirely precluded from establishing liability.

In addition, because the *McNeil* verdict involved only the right of first refusal/compensation rules of Plan B, plaintiffs would still have to prove defendants' liability concerning the other challenged restraints, most significantly the college draft and the league's preseason pay policies, with the latter claims burdened by pending counterclaims for substantial sums.

(b) Even if such liability were established, the results of the *McNeil* trial demonstrate that the class members would face substantial obstacles and uncertainties in proving damages. Evaluating the same type of damage issues presented here, the *McNeil* jury awarded no damages to four of the eight plaintiffs, while the four other plaintiffs received far less than they had sought, despite plaintiffs proffering substantial evidence in support of their damage claims.[37] *Cf. Kapp v. National Football League*, 586 F.2d 644, 648 (9th Cir.1978) (player asserting multimillion dollar claim failed to prove that challenged restraint caused any damages). Finally, after presiding over the *McNeil* trial, the court notes that one cannot discount the reluctance of a jury to award damages to professional football players, who are readily perceived as successful, highly paid individuals. *See Alexander*, 1977–2 Trade Cas. ¶ 61,-730, at 72,995, 1977 WL 1497, at *16 (damages uncertain because there was "no assurances that class members' claims would be sympathetically viewed by the jury"); *Robertson*, 72 F.R.D. at 69 (it would be difficult to convince a jury that professional basketball players should be paid more money).

(c) Even if it were conclusively established that all of the player rules challenged in the present class action violate the antitrust laws, there is uncertainty as to the scope of injunctive relief that would be afforded to the plaintiffs. If the present case is not settled, plaintiffs will likely face further litigation concerning the "reasonableness" of some other modified player reservation system adopted by defendants.[38]

6.3 *The Benefits to the Class.* The terms of the Stipulation and Settlement provide for substantial benefits to the class. Those benefits include the following:

**37.** The following is a comparison of the damages that plaintiffs' expert, Michael Glassman, calculated for the *McNeil* plaintiffs versus the actual damages awarded by the jury:

| Plaintiff | Actual Damages * | Estimated Damages | |
| --- | --- | --- | --- |
| | | Plan B Model | USFL Yardstick |
| Mark Collins | $178,000 | $ 396,000 | $ 387,000 |
| Don Majkowski | 0 | 1,366,000 | 1,338,000 |
| Tim McDonald | 0 | 681,000 | 668,000 |
| Freeman McNeil | 0 | 399,000 | 383,000 |
| Frank Minnifield | 50,000 | 425,000 | 410,000 |
| Niko Noga | 0 | 190,000 | 184,000 |
| Dave Richards | 240,000 | 480,000 | 473,000 |
| Lee Rouson | 75,000 | 100,000 | 97,000 |
| TOTAL | $543,000 | $4,037,000 | $3,940,000 |

* Before trebling.

The court notes that plaintiffs' actual experience in *McNeil* undermines the expert opinion concerning damages proffered by various objectors.

**38.** In *McNeil* and *Jackson*, defendants made perfectly clear their intent to impose Plan C, Plan D and so on, until one passed muster.

(a) A radically modified player reservation system that provides for substantial unrestricted free agency for veteran players, a result that is consistent with the primary goal of players in this and predecessor lawsuits. The terms of the settlement ensure that almost every player with at least five years of experience (four, if a salary cap is in place) will, on contract expiration, have the opportunity to offer his services to other teams. *See supra* ¶ 4.1(a) (detailing provisions).

(b) Higher "tender" requirements before a club can place any restrictions on a player's mobility. For instance, in order to invoke the narrow exceptions for Franchise and Transition players, clubs must tender very substantial offers to the players, so as to make those players among the highest paid in professional football. *See supra* ¶ 4.1(d) (setting forth tender required for Franchise Players); ¶ 4.1(e) (detailing tender required for Transition Players). Similarly, with respect to those players with as little as three years of experience, clubs can limit their rights to become unrestricted free agents only if their former teams tender substantial offers. *See supra* ¶ 4.1(b) (discussing rules for such players).

(c) Lesser restrictions on those players who are subject to free agency limitations. Under Plan B, most restricted players were subject to both a right of first refusal and compensation of two first round draft picks. However, the Settlement Agreement provides that the restrictions on such players will vary from a minimum of a right of first refusal alone to a maximum of a right of first refusal plus compensation of one first round and one third round draft pick; greater restrictions will require substantially higher tender offers.

(d) A fewer number of rookie players will be subject to the college draft, which is to consist of seven rounds (eight in 1993) as compared to the prior draft, which consisted of twelve rounds. All other college players will be unrestricted free agents. *See supra* ¶ 4.2 (detailing college draft provisions).

(e) Substantial league-wide and team minimum "guarantees" in the form of a percentage of revenues that is to be paid to players in the event a salary cap were to go into effect. *See supra* ¶ 4.4 (describing various guarantees).

(f) Strict anti-collusion provisions with an expedited and comprehensive enforcement mechanism to deter and punish any collusion by defendants. *See supra* ¶ 4.7 (discussing anti-collusion provisions).

(g) Settlement payments totalling $115 million to be distributed among *White* class members. A rough gauge of the magnitude of the settlement fund may be provided by comparing it to the recovery of the class in the *Alexander* case, which also sought a league-wide recovery for injuries to players accruing over several years as a result of a similar NFL system of veteran player restraints. In *Alexander*, 3,292 players participated in a fund of $13,675,000, and players' average share was approximately $4,100. 1977–2 Trade Cas. ¶ 61,730, at 72,996–97, 1977 WL 1497, at *18–19.[39] In the present case, the bulk of the fund is to be distributed among approximately 1100 class members with Plan B damage claims, and the average share for those class members is approximately $100,000, which is twenty-five times greater than the average recovery in *Alexander*.

Another rough indication of the adequacy of the settlement is to compare the amount that each player will receive for a year of damages in 1990, 1991 or 1992, that is, the value of one point in the distribution formula, with the recovery actually obtained by the eight plaintiffs in the *McNeil* case. It is estimated that the settlement will provide each class member with approximately $70,000 for every year in which he was subject to the Plan B rules between 1990 and 1992, as compared to an average recovery per year of damages by the *McNeil* plaintiffs of $36,200.[40] Many class members will receive more than one point, with the maximum re-

---

**39.** As previously noted, the *Alexander* settlement employed a point system similar to the one used here.

**40.** That figure results from dividing the total damages, before trebling, found by the jury in *McNeil*, $543,000, *see supra* note 37, by fifteen years, the total number of years for which plaintiffs sought damages.

covery of 3½ points for players who were restricted in all four years, resulting in a payment of approximately $245,000.

6.4 Since the court entered its preliminary approval order on February 26, 1993, the substantial benefits to class members provided by the Stipulation and Settlement Agreement have already become apparent. In just a little over a month, seventy-eight unrestricted free agents have entered into new contracts, fifty-three of them with new teams. (Quinn Supp.Aff. ¶ 9.) Additionally, at least ten restricted free agents, who are subject to first refusal and compensation rights, have received offers from other teams. (Quinn Supp.Aff. ¶ 11.) Of those, four players have already moved to new teams and two others may still do so. Players designated as Transition Players have also been receiving offers. To date, at least four Transition Players have received offers from other teams, and one has contracted with a new club and changed teams. (Quinn Supp.Aff. ¶ 15.) Those players have also received substantial salary increases. *Id.* The court thus concludes that the marketplace experience during the first month of the new free agency system strongly confirms the substantial benefits that the Settlement Agreement bestows on the class.

### B. *Complexity, Expense and Likely Duration*

6.5 Continued litigation of the present action would be complex, expensive and protracted. First, various liability issues may be affected, or even precluded, by an appeal of the *McNeil* case. As previously discussed, defendants would likely appeal the *McNeil* verdict and would seek to stay the present case while their appeal is pending. *See supra* ¶ 6.2(a) (noting grounds on which defendants are likely to appeal). An appeal in the *McNeil* case would likely be protracted, presenting novel and complex legal issues. *See supra* ¶ 2.23 (discussing conflicting case law concerning various issues presented by these cases).

6.6 Apart from the liability issues relating to Plan B, there are also additional liability issues that would have to be tried, including the legality of the college draft and the issue of preseason pay. Some indication of the time and resources needed to prepare

and resolve a trial on the draft may be obtained by looking at the *McNeil* case, in which years of preparation and months of trial were required to adjudicate the legality of the Plan B restraints on veteran players.

6.7 Issues concerning injunctive relief are also complex. Whether granted as a permanent injunction in the *McNeil* case, a preliminary injunction in the present action, or both, any court-ordered relief against the current NFL player reservation system would likely provoke further litigation and appeals.

6.8 Beyond liability and injunctive relief lie damage issues that could be even more complex. The courts that approved the settlements of the analogous *Alexander* and *Robertson* cases both noted that proof of damages in cases such as this can be extremely time-consuming and costly. *Alexander*, 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,995, 1977 WL 1497, at *15 (trial of damages issues would be "lengthy, costly and almost overwhelming"); *Robertson*, 72 F.R.D. at 70. Plaintiffs' experience in *McNeil* underscores the problems in proving such damages. *See supra* ¶ 6.2(b) & note 37.

### C. *Class Counsel and Class Members Believe that the Settlement is Reasonable*

6.9 As detailed in the declarations of James W. Quinn and Edward M. Glennon, submitted in support of final court approval of the settlement, plaintiffs' counsel strongly believe that the proposed settlement is reasonable, fair and in the best interest of the class. As representatives of the plaintiffs in the *Powell* and *McNeil* cases, class counsel have been intimately involved in the entire five-year history of related lawsuits which culminated in the present settlement. The court therefore affords considerable weight to the opinion of experienced and competent counsel that is based on their informed understanding of the legal and factual issues involved. *See Armstrong*, 616 F.2d at 325 ("[w]hile the court ... should not abdicate its responsibility to review a class action settlement merely because counsel support it, the court is entitled to rely heavily on the opinion of competent counsel"); *Welsch*, 667 F.Supp.

at 1295 (the court is to give "great weight to . . . the judgment of experienced counsel").

6.10 It is also significant that class counsel consulted with the NFLPA in negotiating the settlement. Since the expiration of the last collective bargaining agreement in August 1987, the NFLPA has supported numerous player lawsuits challenging the legality of various NFL player restraints, and it has entirely funded the present class action, its predecessors *Powell* and *McNeil,* and various other related lawsuits that are being settled simultaneously with this case. Based on their consultation with the NFLPA and with the class representatives, class counsel believe that the reaction of the overwhelming majority of the players to the settlement has been extremely favorable. (Quinn Aff. ¶ 79.)

6.11 The overall favorable response of the plaintiffs and class members to the proposed settlement strongly supports settlement of this action. After extensive notice by mail and publication, more than ninety-eight percent of the class have supported the proposed settlement; only eighty-nine class members have filed objections to the proposed settlement out of a class comprised of more than five thousand class members.

### D. *The Extent of Discovery Completed and the State of the Proceedings*

6.12 The extent of discovery completed and the stage of the proceedings at which settlement is reached are important factors because they are indicative of both the court and counsel's ability to evaluate the merits of plaintiffs' claims. *Armstrong,* 616 F.2d at 325; *Welsch,* 667 F.Supp. at 1297. Although the present case is technically in its early stages, the evaluation of the merits of plaintiffs' claims is necessarily informed by the comprehensive records compiled in the prior player lawsuits involving similar or identical issues. Just as the *Alexander* court was able to evaluate the propriety of the proposed class action in light of its experience in the *Mackey* case, here the *McNeil* case, which after years of discovery and a three-month trial has been litigated through verdict, provides a sound basis on which to evaluate the strengths and weaknesses of plaintiffs' case and the merits of the proposed settlement.

### E. *The Settlement is the Product of Arm's Length Negotiations*

6.13 The proposed settlement is the culmination of over five years of hard fought litigation in which NFL players, represented by class counsel, challenged the legality of the NFL player reservation system. *Cf. Robertson,* 389 F.Supp. at 899 ("[t]he four-year history of this litigation is sufficient indication that the named plaintiffs and their counsel will fairly and adequately protect the interests of the class"). As previously discussed, during the course of the litigation, the court presided over various related cases and participated in the final stages of the settlement negotiations. As a result of its involvement, the court is aware that the settlement was not reached easily, but represents the product of long and difficult negotiations, conducted in good faith and at arm's length by experienced and able attorneys. (*See also* Quinn Aff. ¶¶ 21–30; Tagliabue Decl. ¶¶ 31–33.) In addition, the court relies on the following factors to support its conclusion that the settlement was negotiated at arm's length: the size and complexity of the Agreement and the compromises reflected therein; the context in which it was reached, that is, after five and one-half years of frequently acrimonious litigation; the court's personal knowledge of the negotiators and the tenacity with which they struggled to protect their principals' interests; and the need for the court's involvement in the final stages of the negotiations. *See also White,* Transcript of Preliminary Approval Hearing at 82–84 (Feb. 26, 1993) (finding no evidence of collusion and concluding settlement was product of arm's length negotiations).

The court also relies on its determination that the terms of the proposed settlement are fair, reasonable and adequate. *See infra* Section VI(F). Under such circumstances, the court may assume that the negotiations were proper. *See, e.g., Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 152 (S.D.Ohio 1992) (citation omitted).

### F. *The Method of Distributing the Settlement Funds is Fair and Reasonable*

6.14 The plan for distributing the settlement proceeds was devised by class counsel, in consultation with the NFLPA, in an effort to ascertain the relative amount of damages

suffered by class members, while also taking into account the relative strengths of the various claims.

6.15 The basic structure of the formula for allocating the fund for Plan B claimants, which equally apportions the fund among players with claims of like nature in the same time period, is modeled on the allocation formula approved by the court in the *Alexander* settlement.[41] Players who entered into new contracts after being restricted in 1990, 1991 or 1992, receive one point for each year of such a contract based on the rationale that the Plan B rules had an overall depressing effect on salaries by depriving all such players, after their contracts expired, of the ability to bargain as free agents in a competitive market. Players who renegotiated or extended their contracts before being restricted in 1990, 1991 or 1992, receive only one-half point for each year of such a contract because the recovery of damages is less certain in those circumstances than for players who were protected after contract expiration. (Quinn Aff. ¶ 60.) While players arguably suffered no damages if already under contract when they were restricted, it could also be argued that any contract renegotiation would have been conducted with the parties' knowledge that the player was going to be restricted, and therefore, the resulting contract would not reflect what the player would have been able to obtain in a competitive market.

6.16 The above point values are reduced by a factor of one-half for damage claims arising out of contracts entered into in 1989 because plaintiffs with those claims, which exist only by virtue of the *Lewis* case, would have less chance of establishing liability than players with claims arising in the later years. The NFL defendants have argued that any claims for damages in 1989 are precluded by the Eighth Circuit's ruling on the labor exemption in the *Powell* case. 930 F.2d at 1301–03. The issue of whether this court's dismissal of 1989 damage claims in *Powell* is binding on the entire *Powell* class, which is comprised of essentially all NFL players,[42] or just the named plaintiffs is currently pending before the Eighth Circuit on defendants' appeal of this court's decertification and dismissal of the *Powell* case. *Powell v. National Football League*, 773 F.Supp. 1250 (D.Minn.1991); *see* Quinn Aff. ¶ 61. No points are attributed to contracts entered into before 1989, because any pre-Plan B claims would appear to be precluded by the Eighth Circuit's ruling in *Powell*, 930 F.2d at 1301–03.

6.17 No points are to be given for new contracts that were signed while players were unrestricted under Plan B, because such unrestricted players were able to obtain substantial benefits thereby, and their damages, if any, would be much smaller and more difficult to ascertain than those of restricted players. No points are to be awarded for damage claims based on the college draft, because it is unlikely that players would be able to establish liability for any draft claims arising prior to 1993. The expiration date of the draft provision in the last collective bargaining agreement extended beyond the rest of the agreement, through 1992, and thus, as a result of the Eighth Circuit's decision in *Powell*, the labor exemption would likely bar damage claims based on the draft until 1993. (Quinn Aff. ¶ 62.)[43]

---

**41.** A similar formula was used in *Robertson* to settle analogous antitrust claims of a class of professional basketball players. (Quinn Aff. ¶ 59.)

**42.** In addition to various subclasses, the *Powell* class seeking relief from veteran player rules consists of:

all veteran players who were on the active roster of a [member] club at the beginning of the 1987 NFL football season, and all veteran players who are at any time on the active roster of, or under contract to, an NFL club prior to the date of a final judgment in this action.

*Powell v. National Football League*, 773 F.Supp. 1250, 1252 (D.Minn.1991) (citing prior orders in *Powell*).

Moreover, if the Eighth Circuit were to rule that this court improperly dismissed various class claims, *see id.*, or that the labor exemption still applies, an issue which is arguably pending in *Powell*, *but see Powell v. National Football League*, 139 F.R.D. 381, 383 (D.Minn.1991) (rejecting that claim), such rulings could preclude all players' claims, including damage claims, based on veteran player restraints.

**43.** The *Brown* court has held that the labor exemption continues until a collective bargaining agreement expires. *Brown v. Pro Football, Inc.*, 782 F.Supp. 125, 130–33 (D.D.C.1991).

6.18 Instead of receiving points for the claims in their respective cases, the named plaintiffs in *White* and *Lewis* are to receive payments amounting to the actual damages that they would have sought if they were to rely on the methodology developed by plaintiffs' expert economist in the *McNeil* case.[44] (Quinn Aff. ¶¶ 54, 55.) That procedure will result in larger recoveries for the named plaintiffs than for other class members, but as previously discussed, the court determines that such preferential treatment of the named plaintiffs is fair and reasonable in the context of the present litigation. *See supra* ¶ 2.18; *Enterprise Energy Corp.*, 137 F.R.D. at 250 (approving class representative "incentive awards" where named plaintiffs took steps to protect interests of class members, thereby effectuating "a Settlement that provides substantial economic and non-economic benefits to the Class Members"); *Luevano*, 93 F.R.D. at 89. Most of the named plaintiffs stepped forward and actually participated in the litigation as witnesses or in discovery. Several of the named plaintiffs also believed that participating as a plaintiff might pose a risk to their careers, a fear that is underscored by defendants' history of retaliating against players who filed such suits. (Berthelsen Aff. ¶¶ 21–24.)[45] Moreover, the named plaintiffs helped to obtain enormous benefits inuring to all class members, therefore the court concludes that it is appropriate

that they be permitted additional consideration. *Alexander*, 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,996; 1977 WL 1497, at *17 (distribution of settlement payments based on a point system was "fair and reasonable" even where "[a]dditional points [we]re awarded to the named plaintiffs").

6.19 The named plaintiffs in the present action, as well as the named plaintiffs in the related player challenges to Plan B that are being simultaneously settled, also receive another benefit. Those players will have the right to refuse designation as either Franchise or Transition Players for the remainder of their NFL careers.[46] (Quinn Aff. ¶ 71.) As previously discussed, in light of the enormous non-monetary benefits to the class achieved by the settlement, as well as the magnitude of the total settlement fund, the court concludes that the additional payments and benefits to the named plaintiffs are not disproportionate to the risks and efforts they have undertaken. The court further notes that the interests of the five named plaintiffs in the present case are not antagonistic to those of the absent class members because the differences in treatment "relate solely to the remedy and not to the subject matter of the litigation." *Alexander*, 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,990, 1977 WL 1497, at *9 (citation omitted); *see supra* ¶ 2.18.

44. Similarly, to the extent that their claims in the preexisting lawsuits are coextensive with any claims that they might have had in the *White* class action, the named plaintiffs in the preexisting lawsuits are not to share in the class settlement fund. (Quinn Aff. ¶ 56.) The procedure of separately settling the preexisting individual cases that laid the groundwork for the present class action is similar to that followed in *Alexander*, in which the preexisting and related *Mackey* case was settled for separate consideration. *Alexander* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,992, 1977 WL 1497, at *19 (discussing separate settlement funds set up for *Mackey* and *Alexander*).

45. The Berthelsen affidavit sets forth specific examples of such retaliation. For example, Kermit Alexander was cut by the Philadelphia Eagles after striking in 1974. The Eagles were subsequently forced to reinstate Mr. Alexander pursuant to an NLRB decision. After becoming the named plaintiff in the class action challenging the Rozelle Rule, Mr. Alexander was again cut by the Eagles. (Berthelsen Aff. ¶ 23(a)).

John Mackey was traded, and as a result, his career was prematurely terminated, in retaliation for his role in the *Mackey* case. *See id.* ¶ 23(b). The NLRB also affirmed an Administrative Law Judge's finding that Sam McCullum was cut by the Seattle Seahawks in retaliation for confronting management on strike issues. *See id.* ¶ 23(c).

Irvin Eatman's situation also demonstrates the pressure that such named plaintiffs face. Mr. Eatman was originally a named plaintiff in *McNeil*. At that trial, his agent, Thomas Condon, testified that when he was negotiating Mr. Eatman's contract with the Kansas City Chiefs, he was informed that the Chiefs would not sign, release or trade Mr. Eatman as long as he remained a named plaintiff in *McNeil*. Mr. Eatman subsequently withdrew as a named plaintiff. *See id.* ¶ 23(c).

46. That provision will likely benefit no more than twenty-five of the plaintiffs named in the various cases, because the remaining named plaintiffs have either retired from professional football, or have not been designated as either Franchise or Transitional Players.

6.20 The apportionment of the settlement fund between the Plan B and preseason pay claims was made by class counsel, in consultation with the NFLPA, in an effort to estimate the relative aggregate value of the different types of claims while taking into account the strength of such claims on the merits. (Quinn Aff. ¶ 64.) Based on the methodology employed by Michael Glassman, plaintiffs' expert economist in the *McNeil* case, plaintiffs in the present action would have sought approximately $530 million in class-wide damages for their Plan B claims. The Plan B settlement fund of $110 million is approximately twenty-one percent of that total. The total class-wide damages sought by plaintiffs for preseason pay claims amounts to approximately $22 million, and the preseason pay settlement fund of $5 million is approximately twenty-three percent of that total. In addition, the entire $5 million fund for preseason claims is to be paid out in the first year of the Agreement. (Quinn Aff. ¶ 64.)

6.21 Both types of claims are subject to substantial uncertainties concerning proof at trial. As previously discussed, the experience of the *McNeil* plaintiffs demonstrates the difficulty of proving damages arising from defendants' player rules. *See supra* ¶ 6.2(b) & note 37. Moreover, liability has not yet been established for the preseason pay claims, thus there is the additional risk that players with such claims will never have the opportunity to prove damages.

In addition to the uncertainties involved in the proof of plaintiffs' affirmative case for the preseason pay claims, defendants have asserted tens of millions of dollars in counterclaims and offsets that could reduce or eliminate any recovery on those claims.

6.22 The formula for distribution of the preseason pay claim fund seeks to equitably apportion the fund among the claimants by comparing each player's share to the amount of his claim without considering the impact of any offsets or counterclaims. The formula is more closely tied to a player's actual "claim" for damages than the Plan B formula because, unlike the inherently uncertain Plan B claims, the amount of a preseason pay claim may be computed by reference to three factors: (i) the player's base salary under Paragraph 5 of his NFL Player Contract; (ii) the number of weeks that the player played before being cut in the preseason period; and (iii) the amount that the player was actually paid. (Quinn Aff. ¶ 65.) As with the Plan B claims, the named plaintiff for the preseason pay claims, Mr. Duerson, is to receive the damages that he would have sought at trial and will not share in the preseason pay settlement fund. (Quinn Aff. ¶ 63.)[47]

6.23 Based on the foregoing, the court concludes that the method of distributing the settlement funds is fair and reasonable.

## VII. THE CLAIMS OF THE OBJECTORS DO NOT WARRANT DISAPPROVAL OF THE SETTLEMENT

7.1 As of April 2, 1993, timely objections to the settlement were filed on behalf of fifty-eight active or former NFL players.[48] In addition, timely objections were filed on behalf of one NFL member club, the Philadelphia Eagles, one college player, Brian Pressler, and one player agent, Robert J. Sheridan.[49]

The court also considered all other, untimely objections that had been filed as of the date of the final fairness hearing, April 16, 1993.[50] There were fifteen such objections filed on behalf of active or former NFL players,[51] and fifteen objections filed on be-

---

47. Similarly, the named plaintiffs in the preexisting *Tice* lawsuit, who are also separately settling their individual claims, will not share in the preseason pay settlement fund but will receive the damages that they would have sought at trial.

48. *See supra* note 11 (listing those objectors).

49. Mr. Sheridan purportedly filed objections on behalf of Brian Pressler, and all other present and future "college and other football players" similarly situated. He also purportedly filed objections on behalf of himself and all present and future agents and attorney-agents similarly situated.

50. As previously noted, at the hearing, the court granted all motions to extend time, ruling that all objections filed as of the hearing date, April 16, 1993, would be considered by the court, whether such objections were timely filed or not. However, the court also ruled that April 16, 1993, was the deadline for objections, and that it would not consider any objections filed after that date.

51. Those objectors were: Brian Blades, Roland James, Pat Carter, Kenneth F. Ruettgers, Jerry Ball, Jeff Bostic, Todd Bowles, Ray Brown, Jason Buck, Earnest A. Byner, Desmond Howard, Anthony Johnson, Brian Mitchell, Ricky Sanders and Paul Siever.

half of college players.[52]

### A. Player and Agent Objections

7.2 As a preliminary matter, the court notes that if the "vast preponderance of the class members" do not object to the settlement, then claims of inadequacy by some class members are entitled to little weight. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir.1974); *cf. Van Horn*, 840 F.2d at 606 ("class settlement may be approved over significant percentage of objections from class members"). In any given year, approximately 1,500 players are employed in the NFL during the course of the regular season. Hundreds of additional players are employed by the NFL clubs each year during the preseason. Class counsel estimates that the *White* class consists of more than 5,000 active and former NFL players, as well as numerous players who are likely to be drafted. The number of class members objecting to the proposed settlement is less than two percent of the total class. The court concludes that the vast preponderance of the class supports the terms of the proposed settlement.

7.3 Other than the Philadelphia Eagles, the overwhelming majority of objectors oppose the settlement because: (i) one or more elements of the proposed player reservation system allegedly violate the antitrust laws, or (ii) one or more provisions of the settlement are allegedly unfair as applied to that player or group of players. The court will address each group of objections in turn.[53]

7.4 A number of objectors contend that the court must withhold its approval because various provisions of the Settlement Agreement violate the antitrust laws.

7.5 In reviewing a proposed class action settlement, the Eighth Circuit has determined that the trial court does not have the privilege or duty of independently resolving the issues of fact and law "which underlie the merits of the dispute." *Grunin*, 513 F.2d at 123 (quoting *City of Detroit*, 495 F.2d at 456). " 'The very purpose of compromise is to avoid the delay and expense of such a trial.' " *Id.* at 124 (quotation omitted).

7.6 When evaluating the propriety of an antitrust class action settlement, the *Grunin* court further held that:

> unless the terms of the agreement are *per se* violations of antitrust law, we must apply a 'reasonableness under the totality of the circumstances' standard to the court's approval.

*Id.* at 124 (quotation omitted).

7.7 Similarly, when affirming approval of a class action settlement involving professional basketball players in *Robertson*, the Second Circuit applied the standard set forth in *Grunin* and held that such a settlement agreement is entitled to approval unless the terms of the agreement are *per se* illegal, are illegal to a "legal certainty" or the settlement authorized future conduct that is clearly illegal. *Robertson*, 556 F.2d at 686 (citing *Grunin*, 513 F.2d at 124).

7.8 In *McNeil*, this court determined that right of first refusal/compensation rules of Plan B should be evaluated under the rule of reason, rather than the *per se* rule. *McNeil*, 790 F.Supp. at 896–97. In making that determination, the court observed that all of the cases to date had "applied the rule of reason rather than the *per se* analysis" to determine whether various NFL player restricts violated the antitrust laws. *Id.*[54] The court concludes that

---

52. Untimely objections were filed on behalf of college players Jesse Becton, Scott Brown, Rudy Thompson, Ernie Lewis, Eugene Brown, Percy Coleman, James Chinn, Ron Alexander, Brad LaCombe, Dan Purcell, Steve Ross, Ron Moran, Steve Robinson, Garrett Washington and Bennie Hargro.

53. Because many of the player-objectors moved to join with others' objections at the final fairness hearing, the court did not address most of the objections individually.

Objections to the adequacy of notice and the certification of the *White* class are discussed *supra.* See Sections I–III.

54. *See; e.g., Mackey*, 543 F.2d at 606, 619 ("the unique nature of the business of professional football renders it inappropriate to mechanically apply *per se* illegality rules"); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1182 (D.C.Cir.1978) ("the legality of player restrictions in professional sports should be governed by the rule of reason"); *Kapp v. NFL*, 390 F.Supp. 73, 82 (N.D.Cal.1974) ("in this particular field of sports league activities the purposes of the antitrust laws can be just as well served (if not better served) by the basic antitrust reasonableness test as by the absolute *per se* test sometimes applied by the courts in other fields"), *aff'd in part and dismissed in part on other grounds*, 586 F.2d 644

at the present time, absent a full trial on the merits, it is unlikely that the proposed settlement, taken as a whole, would be deemed a *per se* violation of the antitrust laws because the Agreement would probably be subject to analysis under the rule of reason.[55] *See Robertson,* 556 F.2d at 686 (court may not disapprove of settlement if "challenged practices have not been held to be per se illegal in any previously decided case"); *Grunin,* 513 F.2d at 124. Moreover, a player reservation system that was more restrictive than the instant settlement was expressly approved in *Alexander.* Accordingly, the court overrules any objections that the settlement as a whole fails because it is *per se* illegal. *Id.*

7.9 Various objectors ask the court to disapprove of the entire settlement as a result of one or two provisions. Alternatively, they ask the court to strike or revise those objectionable provisions before approving the settlement.

7.10 If, however, the court concludes that the Settlement Agreement as a whole is fair, reasonable and adequate to the class, its inquiry is ended and it should approve the entire settlement. This court has previously determined that:

> in acting to protect the interests of the class when reviewing a settlement, the court cannot rewrite or modify the terms of the agreement.... The settlement must be approved or disapproved as a whole.

*Welsch,* 667 F.Supp. at 1289–90 (citations omitted). Another judge in this district has similarly ruled that:

> [a]lthough the court must act to protect the interests of the class when reviewing the proposed settlement, the court also

recognizes that it is limited in its ability to change that agreement. The proposed settlement must stand or fall as a whole.... The court is not to dictate or rewrite the terms of the proposed agreement.

*Holden,* 665 F.Supp. at 1406 (citations omitted).

Thus, even if it were sympathetic to objections directed at one or more provisions of the Settlement Agreement, the court may not pick and choose which provisions to approve and which to disapprove.

7.11 Moreover, after carefully considering all of the objections that call into question a specific provision or provisions of the Settlement Agreement, the court nonetheless concludes that the Agreement as a whole is fair, reasonable and adequate to the class. Accordingly, the court will not deny final approval on the basis of those objections.

 7.12 Taken as a whole, the revised player employment rules set forth in the Settlement Agreement constitute a new and unique approach to player employment in the NFL. Class counsel and the NFLPA believe that the entire Agreement will benefit the overwhelming majority of the players in the NFL, and raise salaries throughout the league. Defendants believe that the provisions challenged by various objectors, including the college draft, the rules concerning modified free agency, the Franchise and Transition Player provisions, the Final Eight Plan and the salary cap, are essential for the maintenance of competitive balance, quality of play and franchise stability.[56]

7.13 Examining the Franchise Player provisions of the Settlement Agreement, the court specifically finds that: (i) a club invok-

---

(9th Cir.1978), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979).

**55.** In *McNeil,* plaintiffs argued that there was "sufficient judicial experience" concerning the illegality of various player restraints "to warrant the application of the *per se* rule" to the challenged Plan B rules. 790 F.Supp. at 896. The court, however, rejected that contention, concluding that it was "bound by the *Mackey* decision, in which the Eighth Circuit determined that the Rozelle Rule should be judged under the rule of reason", not the *per se* rule. *Id.* at 897. Nevertheless, if there is future litigation concern-

ing the legality of any NFL player rules, plaintiffs' argument may be adopted by some court. This court, however, makes no ruling on the issue.

**56.** Defendants further claim that challenged provisions are consistent with the jury's verdict in *McNeil,* and Eighth Circuit law, under which defendants contend that they are entitled to impose some type of player reservation system. It is unclear, however, whether those assertions are supported by either the *McNeil* verdict or Eighth Circuit law, and the court does not rule on defendants' claims.

ing the Franchise Player provisions must make an extraordinarily high salary tender to any player so designated;[57] (ii) such required tenders act merely as a floor and not a ceiling on the designated player's salary;[58] and (iii) the Franchise Player provisions are extremely limited in scope.[59] The court further notes that any tenders for Franchise Players next year will clearly reflect the market increase in player compensation this year for other players in the same position. (Quinn Supp.Aff. ¶ 13); *see supra* ¶ 4.1(d) (setting forth required tender). Moreover, Franchise Players may use contracts entered into by other players in the same position this year as a benchmark for their own negotiations, thereby benefitting from market increases in the current year.[60] Thus, despite their designation, Franchise Players will still receive substantial benefit from the increased competition for player services.[61]

Based on the foregoing, the court concludes that objections concerning the Franchise Player provisions provide no basis on which to reject the proposed settlement.

7.14 The challenged Transition Player provisions similarly require substantial tenders that must be made to any player so designated.[62] In addition, any player designated as a Transition Player next year will derive substantial benefit from the increased competition for player services because his tender will reflect this year's increase in salaries for players in the same position. *See supra* ¶ 4.1(e) (discussing required tender). Moreover, Transition Players are subject only to a right of first refusal, there is no corresponding draft pick compensation.[63] The evidence before the court indicates that the Transition Player provisions have not prevented some players from receiving offers from other clubs.[64] Those provisions are also

**57.** Of the twenty-eight member clubs, only ten have designated Franchise Players, likely reflecting the magnitude of the tender required to make such designation. (Quinn Supplemental Aff. ¶ 12.) The court thus rejects the contention that the minimum tender provides no benefit, because it protects class members to the extent that it deters teams from making such designations. Moreover, as discussed above, it does provide individual Franchise Players with a floor under which their teams may not bargain.

Although ten players have been designated as Franchise Players, two of those ten are named plaintiffs, and have refused such designation. The court notes that objections have been filed on behalf of the remaining eight players designated as Franchise Players.

**58.** As class counsel noted in his affidavit, one of the objectors:

James "Jumbo" Elliott, an offensive tackle who was designated by the New York Giants as their Franchise Player, received a minimum tender of $1,167,500, which is 91% more than his previous year's salary of $612,000.

(Quinn Supp.Aff. ¶ 13.) The affidavit further states that another Franchise Player and objector, Steve Young, is expected:

to negotiate a new contract paying him $4 to $5 million per year, even though the required tender at his position (quarterback) is $3,264,000.

*Id.* ¶ 14.

**59.** A team may designate only one Franchise Player per year. Moreover, the required tender offer for Franchise Players is only for a one year contract. In order to restrict the same player for another year, the team must make another tender.

**60.** The court therefore rejects the contention that Franchise Players will always be one year behind other players for purposes of participating in market-wide salary increases.

**61.** The court also rejects the contention that the Franchise Player rules are more restrictive than the Plan B rules because it was theoretically possible to change teams under Plan B if a new team was willing to pay the required compensation to a player's former team. Although such movement was theoretically possible, the evidence in *McNeil* demonstrated that, in reality, the Plan B compensation requirement was such an effective deterrent that during the four years in which Plan B was imposed, only three restricted players received offers from other teams, and no restricted player ever switched teams.

**62.** The tenders, like those for Franchise Players, operate as a floor. For example:

Pierce Holt, a defensive lineman formerly with the San Francisco Forty–Niners, has signed a three-year *guaranteed* contract with the Atlanta Falcons worth $7.5 million. This is far in excess of the minimum tender offer of $1,476,114 for players at his position (defensive end) and represents an increase of more than 240% over his average salary under his previous contract of $733,000.

(Quinn Supp.Aff. ¶ 15) (emphasis in original).

**63.** Thus, the Transition Player rules are less restrictive than the Plan B rules, which required such compensation.

**64.** Despite being subject to a right of first refusal, at least four Transition Players have already received offers from other teams. (Quinn Supp. Aff. ¶ 15.; Tagliabue Decl. ¶ 26.)

extremely limited in application. Based on the foregoing, the court concludes that the objections to the Transition Player provisions do not present a basis for disapproving the entire settlement.

▪ 7.15 Various objectors challenge the restricted free agency provisions of the Settlement Agreement, which allow the clubs to retain certain first refusal and compensation rights to veteran players whose contracts have expired. *See supra* ¶¶ 4.1(b) & (c) (detailing provisions). When viewed in the context of the entire settlement, the court determines that those provisions, like the Franchise and Transition Player provisions, do not warrant disapproval of the Settlement Agreement. In making this determination, the court relies on the following facts: (i) clubs are required to make substantial salary tenders in order for rights of first refusal or compensation to be maintained; and (ii) the draft choice compensation to a club if it fails to resign a restricted free agent is generally much less than the two first round draft choices required under Plan B. Moreover, the evidence indicates that the right of first refusal and relaxed compensation rules do not completely foreclose competitive bidding because a number of restricted free agents have received offers from other clubs, and several have already changed teams. (Quinn Supp.Aff. ¶ 11; Tagliabue Decl. ¶ 16.) Accordingly, the court finds that the objections to the restricted free agency provisions fail to provide a basis for rejecting the Settlement Agreement.

7.16 The court has also considered objections to the salary cap provisions, and concludes that such objections do not warrant disapproval of the settlement. The court notes that the salary cap must not be viewed in isolation, but rather, in connection with the entire agreement accepted by class counsel, including the liberalized free agency provisions and the minimum revenue guarantees

that would accompany the "triggering" of the salary cap provisions.

It is also significant that all aspects of the new free agency system contained in the Settlement Agreement, including the salary cap provisions, will likely be included in a new collective bargaining agreement, under which such provisions would be exempt from antitrust law as a result of the nonstatutory labor exemption.

▪ 7.17 Objections have also been filed on behalf of sixteen college players concerning the college draft and entering player pool.[65] The court finds, however, that those objections do not warrant disapproval of the Settlement Agreement. The entering player pool, which permits continued individual salary negotiations,[66] is part of the overall free agency system, and sets its limits based on the large amounts that rookies have earned in the last three years. The pool will also be adjusted to reflect increases in NFL revenues. The draft is reduced this year from twelve to eight rounds, and seven rounds thereafter, thus providing more college players with the right to free agency. In addition, none of the college players who filed objections were drafted, and thus have no basis on which to object to the provisions of the Settlement Agreement concerning the college draft. Accordingly, the court rejects the objections asserted on behalf of the college players.

▪ Robert Sheridan, an attorney-agent who filed objections on behalf of the college players, also objected to the draft and entering player pool on behalf of himself and all other agents similarly situated. Mr. Sheridan, however, is not a class member. Moreover, any injury he alleges is too attenuated and speculative to provide him with standing to assert a claim concerning either entering player pool or the draft, and none of the college players he claims to represent were actually drafted. The court therefore over-

---

65. The court notes that Mr. Sheridan widely distributed a letter in which he sought to "warn" college players of the impending settlement hearing and to solicit their objections to the settlement. His efforts, however, produced only sixteen objectors. The court concludes that the objections set forth on behalf of the college players are not widespread.

66. The court notes that when defendants originally imposed Plan B, it contained a provision that would have barred all individual contract negotiations as of February 1, 1993, and established a wage scale for all players' services. *McNeil,* 790 F.Supp. at 875–77.

rules the objections filed on behalf of himself, and all other agents similarly situated.

The court also rejects Mr. Sheridan's objections concerning the proposed changes in the NFL Player Contract. Mr. Sheridan argues that the modification eliminates protections provided under the existing version by making it easier for teams to cut players. Testimony at the hearing, however, indicated that under the present version of the NFL Player Contract, defendants may cut players at anytime, for any reason. *White*, Transcript of Final Fairness Hearing at 231–26 (Apr. 16, 1993) (testimony of Steve Jordan). Thus, the protection on which Mr. Sheridan relies does not exist under the current version of the Contract. The court finds that the proposed changes do not alter any protection previously provided. Accordingly, the court rejects any objections concerning the proposed changes to the NFL Player Contract.

■ 7.18 Finally, the court rejects various requests to postpone final approval of the Settlement Agreement for purposes of permitting discovery. The court first notes that class members have been provided with, or had available to them, more than adequate information with which to analyze the fairness and reasonableness of the settlement. Moreover, if there is no evidence of collusion in the negotiation process, objectors have no right to seek discovery concerning the negotiations of a class action settlement. *See, e.g., In re Domestic Air Transp. Antitrust Litig.*, 144 F.R.D. 421, 424 (N.D.Ga.1992) (citing *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir.1987)). As previously discussed, the court finds that there is no evidence of any such collusion. *See supra* ¶ 2.19; *see also White*, Transcript of Preliminary Approval Hearing at 82–84 (Feb. 26, 1993) (finding no evidence of collusion and concluding settlement was product of arm's length negotiations). The court declines to postpone approval pending discovery.

**B.** *The Philadelphia Eagles' Objections*

7.19 One NFL member club, the Philadelphia Eagles, also opposes final approval of the Settlement Agreement. The Eagles argue that court approval of the settlement should be denied because: (i) the proposed settlement of related litigation concerning players' licensing rights is unlawful; (ii) the NFLPA's role in settlement negotiations was in violation of the National Labor Relations Act; and (iii) the Settlement Agreement improperly requires the court to issue an advisory opinion concerning the scope of the nonstatutory labor exemption.

■ 7.20 As a threshold matter, the court determines that the Eagles lack standing to assert such objections.[67] A nonsettling defendant has standing to object to a settlement only if it can demonstrate some form of legal prejudice. *See, e.g., Alumax Mill Prods., Inc. v. Congress Fin. Corp.*, 912 F.2d 996, 1001–02 (8th Cir.1990). Having found that the settlement as a whole is not *per se* illegal, the court concludes that the Eagles cannot demonstrate any legal prejudice.

Moreover, on July 20, 1992, at a duly constituted and authorized meeting of the member clubs of the NFL, the Eagles, along with twenty-five other clubs, voted to delegate complete authority to the Executive Committee of the NFL Management Council (CEC) to propose, evaluate, negotiate and consummate a settlement agreement with class counsel. The CEC engaged in such settlement negotiations and on January 6, 1993, unanimously approved this settlement in principle, and on February 26, 1993, unanimously approved the Stipulation and Settlement Agreement. Under the Articles of Association and Bylaws of the NFL Management Council, the Eagles are bound to abide by those actions.

In addition, the Eagles' objections violate their obligations as parties to the Stipulation and Settlement Agreement "not [to] take any action to delay or hinder ... Court approval" of the Agreement. The objections also violate the terms of this court's order of Febru-

---

**67.** Despite that determination, the court nevertheless considered the Eagles' written submissions, including its proposed findings, and allowed the team to set forth its objections at the final fairness hearing.

ary 26, 1993, which granted preliminary approval of the Stipulation and Settlement Agreement. That order provides in relevant part that:

> 10. The parties are hereby preliminarily and temporarily ordered to abide by the terms of the Stipulation and Settlement Agreement until a final ruling of this Court approving or rejecting the Stipulation and Settlement Agreement.

*White,* No. 4–92–906, slip op. at 5 (D.Minn. Feb. 26, 1993).

7.21 In any event, the court questions the plausibility of the Eagles' purported objections. The court notes that the Eagles have an ongoing disagreement with the league concerning the compensatory draft selections they have been offered for the named plaintiffs they have lost, or whom they may lose in the future. They are also demanding a compensatory draft selection for Keith Jackson, a player released from the right of first refusal/compensation rules of Plan B pursuant to this court's order of September 24, 1992. *Jackson v. National Football League,* 802 F.Supp. 226 (D.Minn.1992). There is evidence before the court that the Eagles' objections are nothing more than an attempt to obtain more compensatory draft selections. (Quinn Supp.Aff. ¶ 41.)

Turning to the specific objections, the Eagles contend that the proposed settlement of the litigation concerning players' licensing rights involving the NFLPA and NFL Properties is illegal because it provides the NFLPA with a monopoly for those rights. *See supra* ¶ 4.13 & note 35 (detailing settlement terms and listing cases to be settled). However, Mr. Braman, owner of the Eagles and Chairman of the Executive Committee of NFL Properties, is reported to have spoken in favor of that settlement. (Tagliabue Decl. ¶ 39.) In addition, sworn statements of class counsel and Commissioner Paul Tagliabue unequivocally state that the NFL has no agreement with class counsel or the NFLPA, as part of the contemplated settlement of the licensing litigation, to terminate its involve-

ment in the player licensing business. *See id.* ¶ 42. Even if that settlement is consummated, NFL Properties plans to continue in the player licensing business. *Id.* ¶ 41. Moreover, if the NFLPA does seek the right to be the exclusive licensing agent of all players, that issue will likely be the subject of future collective bargaining between the NFL and the NFLPA. Based on the foregoing, the court determines that Mr. Braman's factual assertions concerning the NFL's alleged agreement with the NFLPA to "exit" the market for player licensing rights may be open to question.[68]

■ 7.22 The court also finds that the Eagles' challenge to the legality of the terms of the proposed settlement agreement in the licensing litigation is irrelevant to the issue of whether the proposed settlement is fair, reasonable and adequate to the class. The licensing lawsuits are related litigation principally between the NFLPA, NFL Properties, and individual NFL players.[69] Under Federal Rule of Civil Procedure 23, the court has no obligation to evaluate settlement agreements in any "related litigation" to which the Stipulation and Settlement Agreement merely refers.

■ 7.23 The court concludes that the NFLPA's role in the settlement negotiations leading to the Stipulation and Settlement Agreement does not provide a basis on which to disapprove of the settlement. Both this court and the General Counsel of the NLRB have concluded that by sponsoring various lawsuits, the NFLPA was not thereby acting as the players' collective bargaining representative. *Powell and McNeil,* 764 F.Supp. 1351 (in *McNeil,* rejecting without discussing defendants' claim that the NFLPA continued to function as a union because it was funding various lawsuits); *see* Defs.' Mem. Opp'n Pls.' Mot. Partial Summ. J. at 10 (Oct. 26, 1990) (raising that contention); *Pittsburgh Steelers, Inc.,* No. 6–CA–23143, 1991 WL 144468 (June 26, 1991). Where it was appropriate

---

68. The court rejects any contention that class counsel has a conflict because of its role in the licensing litigation. After Judge Lamberth raised the issue of a possible conflict in the *Lewis* case, class counsel withdrew from its representation of the NFLPA in the licensing litigation. The court

therefore concludes that any alleged conflict has been cured. (Quinn Supp.Aff. ¶¶ 38–39); *see also supra* note 29 (finding that no such conflict exists).

69. Those lawsuits are not before this court.

for the NFLPA to finance the prosecution of antitrust litigation challenging terms and conditions of employment, the court finds that the NFLPA's role as consultant to class counsel in settling the same litigation is also lawful and appropriate.

7.24 Nor was the NFLPA's role in this class action an improper inducement to union formation. The court notes that labor unions increasingly use litigation as a method of organizing employees. *See, e.g., Shaffer v. Farm Fresh, Inc.,* 966 F.2d 142 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992); *cf. Pittsburgh Steelers, Inc.,* No. 6–CA–23143, 1991 WL 144468, at *4 n. 8 (June 26, 1991) (as long as NFLPA's disclaimer of its union status was "otherwise unequivocal and adhered to", it was irrelevant that the disclaimer "was motivated by 'litigation strategy,' i.e., to deprive the NFL of a defense to players' antitrust suits"). Moreover, there is no evidence before the court to support such a claim. *See infra* Section X (detailing the reestablishment of the NFLPA as players' collective bargaining representative).

7.25 The Eagles also contend that any findings by the court concerning the applicability of the labor exemption to the settlement would constitute an advisory opinion. The court concludes, however, that any findings on the applicability of the nonstatutory labor exemption to the terms of the Stipulation and Settlement Agreement would not be advisory to the extent that such terms are incorporated in any new collective bargaining agreement. A central issue in the present case, as in *McNeil* and *Powell,* is the applicability of the nonstatutory labor exemption to the NFL's player rules. As part of the compromise of those issues, class counsel has agreed that the new rules would be protected by the labor exemption for the express term of any new collective bargaining agreement in which such rules are incorporated. Accordingly, it would not be advisory for this court to find, pursuant to any joint petition by the parties to the Settlement Agreement, that the labor exemption applies to the new player employment rules to the extent they are incorporated in a new collective bargaining agreement, and for the express term thereof. *Cf. Jensen v. United States,* 743 F.Supp. 1091, 1103 (D.N.J.1990) (where settlement agreement provided for a judicial determination of the constitutionality of certain agency procedures, the court's decision was not advisory).

7.26 For the same reasons, the labor exemption findings contemplated by the Settlement Agreement would not constitute an improper waiver of any class member's rights. *See Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,991, 1977 WL 1497, at *9 ("[a]ny settlement or consent order would have had to deal with future rules in order to afford appropriate relief to plaintiffs and to be acceptable to the defendants").[70]

7.27 Based on the foregoing, the court rejects all of the Eagles' objections to the Settlement Agreement.

7.28 Defendants suggest that the court sanction the Philadelphia Eagles because of its objections. Although troubled by the Eagles' apparent disregard of the court's order of February 26, 1993, and the implausibility of the objections raised, the court nonetheless declines to sanction the Eagles at the present time.

7.29 Based on the foregoing, the court makes the following findings of fact and conclusions of law:

(a) The terms of the Stipulation and Settlement Agreement fundamentally modify the NFL's rules, policies and practices regarding veteran player movement and employment. The settlement also fundamentally modifies by agreement the college draft, the NFL Player Contract, and various other terms and conditions of NFL player employment.

(b) The revised player mobility and employment rules represent a successful effort by NFL players to eliminate Plan B, and to bring about substantial modifications in the principles relating to veteran player transfers.

---

**70.** The court notes that although courts disagree on its scope, no court has determined that the nonstatutory labor exemption ends before the expiration of the parties' collective bargaining agreement. *See supra* note 17 (discussing conflict between various labor exemption rulings).

(c) Under Eighth Circuit law, when evaluating the present Settlement Agreement, it is unnecessary for the court to determine whether every provision of the settlement, if adopted outside a settlement context and made subject to a trial on the merits, would be deemed reasonable after a full rule of reason inquiry. In fact, the court should not make such inquiry.

(d) The Settlement Agreement, as a whole, is not *per se* illegal.

(e) The court overrules all objections for the reasons previously set forth, and concludes that the overall agreement is fair, reasonable and adequate to the class.

## VIII. MOTIONS TO INTERVENE

8.1 Based on the court's determination that the overall agreement is fair, reasonable and adequate to the class, the court denies all motions to intervene except to the extent that the movants, other than Mr. Sheridan and the *Tice* plaintiffs,[71] shall be permitted to intervene as "intervenor-objectors" solely for purposes of preserving their rights to appeal any judgment entered by the court in connection with the Stipulation and Settlement Agreement.[72] *See Croyden Assocs. v. Alleco, Inc.,* 969 F.2d 675, 678–80 (8th Cir.1992) (unnamed class member must move to intervene in order to preserve right to appeal), *cert. denied,* —— U.S. ——, 113 S.Ct. 1251, 122 L.Ed.2d 650 (1993).

However, none of the movants shall be considered named "plaintiffs" under the terms of the Stipulation and Settlement Agreement, none of the complaints in intervention shall be filed, and the named parties need not answer or otherwise respond to any of the complaints in intervention. *See supra* note 72.

The motions to intervene made on behalf of Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith, Van Waiters, Broderick Thompson and Jerry Ball expressly reserve those players' "jurisdictional and other defenses." As a result of their various filings with the court, their appearance to object to the settlement and their motions to intervene, the court finds that those players have submitted to the court's jurisdiction because they have not confined their arguments to the claim that they are beyond the court's jurisdiction, but rather have objected to the merits of the proposed settlement. *See, e.g., Trans World Airlines, Inc. v. Mattox,* 897 F.2d 773, 787 (5th Cir.1990) (finding intervenors waived any objection to personal jurisdiction when their arguments went "to the heart of the issue before the district court"). As discussed below, the court also finds that it has jurisdiction over those players and their individual lawsuits, which are currently pending in the Central District of California, under the All–Writs Act. *See infra* ¶ 9.3 (finding that the court has such jurisdiction). Accordingly, the court denies their motions to

---

71. The *Tice* plaintiffs are: Gary Hogeboom, William H. Mandley, James J. Skow, Curt E. Singer, Ronald A. Mattes, Shawn Miller, Bob Nelson, Jeff L. Walker, Tim Smiley, Steven W. Baack, Troy Johnson, Thomas D. Sanders and Clifford Charlton.

72. Formal motions to intervene were filed on behalf of: Wilber Marshall, Paul Gruber, Terry Orr, Shane Collins, Ron Middleton, Mark Schlereth, Kelly Goodburn, David Gulledge, Ed Simmons, Matt Elliott, Joe Jacoby, Sidney Johnson, Kurt Gouveia, Ravin Caldwell, Mark Rypien, James Jenkins, Johnny Thomas, Eric Williams, Don Warren, Jeff Bostic, Todd Bowles, Ray Brown, Jason Buck, Earnest A. Byner, Desmond Howard, Anthony Johnson, Brian Mitchell, Ricky Sanders and Paul Siever.

At the hearing, the following objectors moved to intervene: Byron Evans, Brian Pressler, Jesse Becton, Scott Brown, Rudy Thompson, Ernie Lewis, Eugene Brown, Percy Coleman, James Chinn, Ron Alexander, Brad LaCombe, Dan Purcell, Steve Ross, Ron Moran, Steve Robinson, Garrett Washington, Bennie Hargro, Carl Lee, Mark Dusbabek, Audray McMillian, Felix Wright, Cody Risien, Mark Harper, Don Beebe, Gregory Scales, Sammy Martin, Brian Blades, Mike Farr, Pepper Johnson, Pat Carter, Maurice Hurst and John Fourcade.

At the hearing, the court granted various motions to intervene solely for purposes of preserving those parties' right to appeal any judgment entered concerning the Stipulation and Settlement Agreement. However, the court did not grant those motions for purposes of filing complaints in intervention, or for any other purpose.

On April 23, 1993, the following players filed motions to intervene: Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith, Van Waiters, Broderick Thompson and Jerry Ball.

intervene to the extent that those players seek to reserve their jurisdictional defenses.

The *Tice* plaintiffs originally filed a motion to intervene, but based on the withdrawal of their objections, the court dismisses their motion to intervene as moot.

Mr. Sheridan's motion to intervene, to the extent that it applies to himself, or other agents, is denied for lack of standing. *See supra* ¶ 7.17 (finding that Sheridan lacked standing to object on behalf of himself or other agents similarly situated).

## IX. DEFENDANTS' MOTIONS TO ENJOIN OTHER ACTIONS

9.1 Defendants also move to enjoin various other actions[73] in which players assert claims for equitable and monetary relief concerning the same player practices at issue in the present case.[74] In support of the motions, defendants rely on this court's: (i) certification of a mandatory Rule 23(b)(1) non-opt-class on January 6, 1993, as amended on February 17, 1993; and (ii) final approval of the Stipulation and Settlement Agreement.

Opponents to those motions argue that they have a constitutional right to opt out of the *White* class, that the court has no jurisdiction to grant such motions and that any injunction concerning various lawsuits filed in the Central District of California would be premature. The court will address each contention in turn.

9.2 As previously discussed, the court determines that due process does not require that absent class members be provided with a right to opt out of the *White* class action. *See supra* Section III. Accordingly, the court rejects those arguments as a basis for denying defendants' motions to enjoin other actions.

█ 9.3 The court further concludes that it has jurisdiction, pursuant to the All-Writs Act, 28 U.S.C. § 1651,[75] to enjoin the various lawsuits subject to defendants' motions. *See, e.g., Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.,* 342 U.S. 180, 183–84, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952) (federal courts have "an ample degree of discretion" in determining how best to administer "multiple litigation in the federal judicial system", and such discretion includes the power to stay pending federal court actions);[76] *In re Joint Eastern & Southern District Asbestos Litig. (Eagle–Picher),* 134 F.R.D. 32, 37 (E.D.N.Y. & S.D.N.Y.1990) (under the All-Writs Act, courts have jurisdiction "to certify a national class action and to stay pending federal and state cases brought on behalf of class members"); *Robertson v. National Basketball Ass'n,* 413 F.Supp. 88, 90 (S.D.N.Y.1976) (enjoining separate federal lawsuit filed by an individual class member in

---

**73.** Those cases are: (a) *Hurst v. NFL,* No. 92–3263 (E.D.La.); (b) *Dusbabek v. NFL,* No. 4–93–126 (D.Minn.); (c) *Lee v. NFL,* No. 4–93–125 (D.Minn.); (d) *McMillian v. NFL,* No. 4–93–99 (D.Minn.); (e) *Wright v. NFL,* No. 4–93–124 (D.Minn.); (f) *Jones v. NFL,* No. 92–2512 (C.D.Cal.); (g) *Sanders v. NFL,* No. 92–4365 (C.D.Cal.); (h) *Matthews v. NFL,* No. 92–4370 (C.D.Cal.); (i) *Hunter v. NFL,* No. 92–4373 (C.D.Cal.); (j) *O'Neal v. NFL,* No. 92–4368 (C.D.Cal.); (k) *Allen v. NFL,* No. 92–7536 (C.D.Cal.); (l) *Norton v. NFL,* No. 93–0029 (C.D.Cal.); (m) *Hurst & Fourcade v. NFL,* No. 93–0766 (E.D.La.); (n) *Harper v. NFL,* No. 4–93–314 (D.Minn.); (o) *Risien v. NFL,* No. 4–93–182 (D.Minn.); (p) *Duncan v. NFL,* No. 93–1481 (C.D.Cal.); and (q) *Evans v. NFL,* Civ. No. 92–878 (D.Ariz.).

**74.** The court rejects various parties' attempts to distinguish their claims from those asserted in the present action, finding that the claims all arise from the same practices at issue in the present action, and are encompassed by the court's certification of the *White* class.

**75.** That Act provides in relevant part that:

> The Supreme Court and all courts established by Act of Congress may issue all writs necessary and appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.
> 28 U.S.C. § 1651(a).

**76.** The court rejects any contention that the Supreme Court's holding in *Kerotest* was limited by considerations of *forum non conveniens,* as that issue was relevant only to the determination of which court proceeding should be stayed, not to the power of a federal court to stay actions pending in other federal courts. 342 U.S. at 185–86, 72 S.Ct. at 222. Moreover, in light of the long history of related litigation before this court, the court concludes that considerations of *forum non conveniens* favor the enjoining of the other pending actions, rather than the present action.

order to protect "the jurisdiction of this court to determine this action, either by trial or by court-approved settlement"). Under the Act, the court may also enjoin actions that were filed, or allegedly filed,[77] before the present action. See Kerotest, 342 U.S. at 183, 72 S.Ct. at 221 (federal courts are not bound by rigid doctrines, such as the "first to file" rule because "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems"). The court concludes that it has jurisdiction to enjoin those lawsuits pursuant to the All–Writs Act.

■ Moreover, the court has proper jurisdiction over the White class action. Under such circumstances, the court does not need a separate basis of personal jurisdiction in order to enjoin individual lawsuits of mandatory class members. Cf. In re State of South Dakota, 692 F.2d 1158, 1162 n. 8 (8th Cir. 1982) ("jurisdictional considerations under the All–Writs Act have been expanded beyond the technical notions of personal and subject matter jurisdiction"). As the Second Circuit held:

the need to enjoin conflicting ... proceedings arises because the jurisdiction of a multidistrict court is 'analogous to that of a court in an in rem action or in a school desegregation case, where it is intolerable to have conflicting orders from different courts.' In effect, ... the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district court required full control.

In re Baldwin–United Corp., 770 F.2d 328, 337 (2d Cir.1985) (quotation omitted); accord Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877, 882 (11th Cir.1989) (it "makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a res to be administered").

In fact, there is ample authority for the proposition that the court has jurisdiction to enjoin other actions even if the parties were not members of the White class. See, e.g., United States v. New York Tel. Co., 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977) ("the power conferred by the [All–Writs] Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order"); In re Baldwin–United Corp., 770 F.2d 328, 338 (2d Cir.1985) ("[a]n important feature of the All–Writs Act is its grant of authority to enjoin and bind nonparties to an action when needed to preserve the court's ability to reach and enforce its decision in a case over which it has proper jurisdiction") (citations omitted)). Accordingly, the court rejects any claim that the motions to enjoin must be denied because it lacks personal jurisdiction over any party.

■ The court concludes that in the present case, it is both necessary and proper to exercise its authority under the All–Writs Act. Based on that authority, the court enjoins the various other pending actions, relying on the following factors:

(1) the long history of related litigation in this court;

(2) to properly effectuate the terms of the proposed settlement, which the court finds to be fair, reasonable and adequate to class members, and to which class members received adequate notice and opportunity to object;

(3) to conserve judicial resources;

(4) to properly protect the court's jurisdiction over the White class action, and to enforce and effectuate its judgment;

(5) to eliminate the risk of inconsistent or varying adjudications which may subject defendants to incompatible standards of conduct;

(6) to prevent the prosecution of other actions that would frustrate the court's ef-

---

77. The court rejects the contention that the Hurst class action was filed before the present action. The White class action complaint was filed in this court on September 21, 1992, nine days before the Hurst case was filed in the Eastern District of Louisiana. See Hurst v. National Football League, Civ. No. 92–3263 (E.D.La. filed Oct. 1, 1992). Moreover, subsequent amendments to the White complaint did not initiate new lawsuits. See Fed.R.Civ.P. 15(c). The court finally notes that the Powell class action, which was filed in 1987, is properly considered the "first" class action filed for purposes of the proposed settlement.

forts to craft a class action settlement in the present case;

(7) to eliminate the risk of inconsistent or varying judgment that may affect the rights of class members and impair their ability to protect their interests; and

(8) in light of the court's determination that the *White* class was properly certified, to utilize the class action mechanism, which is ideally suited for resolving the claims at issue, to settle this massive litigation.

9.4 The court also rejects the contention that defendants' motions to enjoin various suits filed in the Central District of California are premature. Although those actions are stayed at the present time, it is undisputed that those plaintiffs, in their most recent status report to the California district court, stated that they intend to move to lift the stays. The court therefore concludes that defendants' motions are not premature.

Based on the foregoing, the court grants defendants' motions to enjoin various other lawsuits.[78]

## X. THE LAWFUL FORMATION OF THE NFLPA AS THE EXCLUSIVE COLLECTIVE BARGAINING REPRESENTATIVE OF NFL PLAYERS

10.1 On January 6, 1993, the parties reached an agreement in principle to settle this class action, as well as various other related litigation.

10.2 After an agreement in principle was reached on January 6, 1993, and after a vote of the Board of the NFLPA to seek to become the collective bargaining representative for the players, the NFLPA began to collect authorization cards from NFL players designating it as the exclusive collective bargaining representative of all present and future NFL players.

10.3 By letter dated March 23, 1993, Richard A. Berthelsen, General Counsel of the NFLPA, informed Paul Tagliabue, Commissioner of the NFL that "[a] majority of the players on 1992 season-ending rosters have now signed cards authorizing the NFLPA to represent them for the purposes of collective bargaining."

10.4 In accordance with an agreement between the NFLPA and the NFL, dated March 24, 1993, the American Arbitration Association conducted a check-off of signed cards of interest against the 1992 season-ending rosters. By letter of March 26, 1993, the American Arbitration Association reported that 873 cards had been duly executed and returned by eligible voters, thus establishing the majority standing of the NFLPA.

10.5 By letter dated March 29, 1993, from Harold Henderson, Executive Vice President for Labor Relations and Chairman of the NFL Management Council, to Eugene Upshaw, Executive Director of the NFLPA, and based upon the evidence verified by the American Arbitration Association that a majority of NFL players have recognized the NFLPA as their exclusive bargaining representative, the NFL voluntarily recognized the NFLPA as the sole and exclusive collective bargaining representative of present and future employee players in the NFL, as set forth in the previous NLRB Certification # 18-RC-8308, dated January 22, 1971.

10.6 Based on the representations and sworn testimony of the parties, it appears that at all times during this process, the NFLPA maintained that it would not accept any help from the NFL, or any of its member clubs. Nor did the NFL, or any of its member clubs, take any action which in any way hindered or supported the formation of the NFLPA as the exclusive collective bargaining representative of all present and future NFL players.

10.7 Based on the foregoing, the court has reached the following conclusions:

(a) The NFLPA has been lawfully formed and selected by the players to serve as the exclusive collective bargaining representative of all present and future NFL players.

(b) Neither the NFL nor any of its members have taken any action which in any way hindered or supported the formation of the NFLPA as the exclusive collective bargaining representative of all present and future NFL players.

(c) The NFL and its member clubs have lawfully recognized the NFLPA as the play-

---

**78.** *See supra* note 73 (listing relevant cases).

ers' exclusive collective bargaining representative.

(d) Accordingly, the NFLPA is fully authorized and empowered to enter into a new collective bargaining agreement with the NFL and its member clubs.

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1. The court denies all motions to intervene on behalf of: Wilber Marshall, Paul Gruber, Terry Orr, Shane Collins, Ron Middleton, Mark Schlereth, Kelly Goodburn, David Gulledge, Ed Simmons, Matt Elliott, Joe Jacoby, Sidney Johnson, Kurt Gouveia, Ravin Caldwell, Mark Rypien, James Jenkins, Johnny Thomas, Eric Williams, Don Warren, Jeff Bostic, Todd Bowles, Ray Brown, Jason Buck, Earnest A. Byner, Desmond Howard, Anthony Johnson, Brian Mitchell, Ricky Sanders, Paul Siever, Byron Evans, Brian Pressler, Jesse Becton, Scott Brown, Rudy Thompson, Ernie Lewis, Eugene Brown, Percy Coleman, James Chinn, Ron Alexander, Brad LaCombe, Dan Purcell, Steve Ross, Ron Moran, Steve Robinson, Garrett Washington, Bennie Hargro, Carl Lee, Mark Dusbabek, Audray McMillian, Felix Wright, Cody Risien, Mark Harper, Don Beebe, Gregory Scales, Sammy Martin, Brian Blades, Mike Farr, Pepper Johnson, Pat Carter, Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith, Van Waiters, Broderick Thompson, Jerry Ball, Maurice Hurst and John Fourcade, except to the extent that the foregoing movants shall be permitted to intervene as "intervenor-objectors" solely for purposes of preserving their rights to appeal any judgment entered by the court in connection with the Stipulation and Settlement Agreement. None of the foregoing movants shall be considered named "plaintiffs" under the terms of the Stipulation and Settlement Agreement;

2. Mr. Sheridan's motion to intervene, to the extent that it applies to him individually, or to other agents similarly situated, is denied in all respects;

3. The motion to intervene on behalf of the following players is denied as moot: Gary Hogeboom, William H. Mandley, James J. Skow, Curt E. Singer, Ronald A. Mattes, Shawn Miller, Bob Nelson, Jeff L. Walker, Tim Smiley, Steven W. Baack, Troy Johnson, Thomas D. Sanders and Clifford Charlton;

4. The complaints in intervention shall not be filed, and the named plaintiffs and defendants need not answer or otherwise respond to any such complaints in intervention;

5. The motions to intervene made on behalf of Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith, Van Waiters, Broderick Thompson and Jerry Ball are expressly denied to the extent that those players seek to reserve their jurisdictional defenses;

6. The motions to extend time are granted to the extent that the court previously granted such motions on the record, that is, all motions to extend time filed on or before April 16, 1993, are granted; all motions to extend time made at the hearing on April 16, 1993, are granted; and no objections filed after April 16, 1993, will be considered by the court;

7. Defendants' motions to enjoin the following actions are granted:

(a) *Hurst v. NFL,* No. 92–3263 (E.D.La.);

(b) *Dusbabek v. NFL,* No. 4–93–126 (D.Minn.);

(c) *Lee v. NFL,* No. 4–93–125 (D.Minn.);

(d) *McMillian v. NFL,* No. 4–93–99 (D.Minn.);

(e) *Wright v. NFL,* No. 4–93–124 (D.Minn.);

(f) *Jones v. NFL,* No. 92–2512 (C.D.Cal.);

(g) *Sanders v. NFL,* No. 92–4365 (C.D.Cal.);

(h) *Matthews v. NFL,* No. 92–4370 (C.D.Cal.);

(i) *Hunter v. NFL,* No. 92–4373 (C.D.Cal.);

(j) *O'Neal v. NFL,* No. 92–4368 (C.D.Cal.);

(k) *Allen v. NFL,* No. 92–7536 (C.D.Cal.);

(l) *Norton v. NFL,* No. 93–0029 (C.D.Cal.);

(m) *Hurst & Fourcade v. NFL,* No. 93–0766 (E.D.La.);

(n) *Harper v. NFL,* No. 4–93–314 (D.Minn.);

(o) *Risien v. NFL,* No. 4–93–182 (D.Minn.);

(p) *Duncan v. NFL,* No. 93–1481 (C.D.Cal.); and

(q) *Evans v. NFL,* Civ. No. 92–878 (D.Ariz.).

All members of the plaintiff class in the present action are permanently enjoined from further pursuit or prosecution of the above listed actions, or any other actions now pending that purport to challenge the same player practices at issue here, or challenge the Stipulation and Settlement Agreement in this action. In addition, all members of the plaintiff class are permanently enjoined from initiating any such actions in the future. The court shall also retain jurisdiction over this action to effectuate and enforce the terms of the injunctions and Stipulation and Settlement Agreement;

8. Defendants' request to sanction the Philadelphia Eagles is denied; and

9. The Philadelphia Eagles' motion for leave to file a response to the named parties' proposed findings of fact and conclusions of law is granted.